**WIXT TELEVISION, INC., Plaintiff,**

**v.**

**MEREDITH CORPORATION and Newhouse Broadcasting Corporation, Defendants.**

**No. 78 Civ 602.**

United States District Court, N. D. New York.

Dec. 12, 1980.

1005

Finley, Kumble, Wagner, Heine & Underberg, New York City, for plaintiff WIXT Television, Inc.; Jeffrey A. Fillman, New York City, of counsel.

MacKenzie, Smith, Lewis, Michell & Hughes, Syracuse, N. Y., McDermott, Will & Emery, Chicago, Ill., for defendant Meredith Corp.; Raymond W. Hackbarth, Syracuse, N. Y., Samuel Weisbard, Chicago, Ill., of counsel.

Bond, Schoeneck & King, Syracuse, N. Y., for defendant Newhouse Broadcasting Corp.; Charles T. Beeching, Syracuse, N. Y., of counsel.

## MEMORANDUM–DECISION AND ORDER

MUNSON, Chief Judge.

### I.

On November 20, 1978, plaintiff WIXT Television, Inc., a New York corporation, filed a private antitrust action in the Northern District of New York against two formidable communications conglomerates, Meredith Corporation and Newhouse Broadcasting Corporation. Plaintiff WIXT operates the American Broadcasting Company (ABC) television affiliate in Syracuse, New York. Defendant Meredith operates television station WTVH in Syracuse, the Columbia Broadcasting Company affiliate, as well as television and radio stations in other communities in the United States.[1] Defendant Newhouse Broadcasting Corporation operates WSYR television and radio stations in Syracuse, which are the National Broadcasting Corporation affiliates, and operates other television and radio stations throughout the United States.[2] Moreover, through its subsidiary, the Herald Company, Newhouse owns and publishes the only local daily morning, afternoon, and Sunday newspapers in Syracuse.

In plaintiff's original complaint, which plaintiff concedes was "hurriedly prepared"[3] and "not as clear as [it] might have been,"[4] plaintiff contends that defendants conspired to foreclose plaintiff from competing for commercial television advertising in Syracuse, New York, in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1, and more specifically the *Noerr-Pennington*[5] doctrine. However, it appears that Meredith's subsequent motions[6] to dismiss plaintiff's complaint or in the alternative to strike portions of the complaint, and a motion by Newhouse for summary judgment, inspired plaintiff to expand its claims. On March 2, 1979, plaintiff moved to amend its

---

1. These include KPHO–TV in Phoenix, Arizona, KCMO–TV–AM and KCEZ(FM) in Kansas City, Missouri, WOW and KEZO(FM) in Omaha, Nebraska, WNEW–TV in Pittsburgh, Pennsylvania. In addition, Meredith is engaged in the publishing and printing businesses.

2. Among these stations are WSYE–TV in Elmira, New York, WAPI–TV–AM–FM in Birmingham, Alabama, WTPA–TV–FM in Harrisburg, Pennsylvania, and KTVI–TV, in St. Louis, Missouri. Newhouse also operates cable television stations in New York State, is one of the largest newspaper chains in the country, and is also engaged in the publishing business.

3. Fillman, February 12, 1979 affidavit ¶ 2, submitted in opposition to summary judgment.

4. Fillman, February 12, 1979 affidavit ¶ 5, submitted in support of plaintiff's motion for leave to file amended complaint.

5. *See Eastern Railroad Presidents Conference v. Noerr Motor Freight, Inc.*, 365 U.S. 127, 81 S.Ct. 523, 5 L.Ed.2d 464 (1961); *United Mine Workers v. Pennington*, 381 U.S. 657, 85 S.Ct. 1585, 14 L.Ed.2d 626 (1965). Plaintiff also asserted claims under Sections 4 and 16 of the Clayton Act, 15 U.S.C. §§ 15 and 26, Section 340 of the New York General Business Law (McKinney), and common law principles prohibiting unfair competition.

6. Meredith later moved to postpone discovery pending this Court's ruling on Meredith's motion to dismiss plaintiff's complaint. This motion was not opposed by plaintiff and was granted by the Court on April 3, 1979.

complaint in order to "clearly allege"[7] that Newhouse has engaged in reciprocal advertising practices in concert with its newspaper affiliate, the Herald Company, which, in its proposed amended complaint, plaintiff seeks to add as a defendant co-conspirator.[8] In addition, plaintiff's proposed amended complaint alleges that Newhouse and Meredith conspired to deprive plaintiff of its affiliation with ABC. After hearing oral argument on all of the above motions on April 9, 1979, the Court reserved its decisions.

In the meantime, plaintiff proceeded with discovery of Newhouse by deposing the vice-president and general manager of WSYR's television and radio stations, David Shurtleff, on March 7, 1979. Plaintiff served Newhouse with a request for the production of documents and things which was complied with by Newhouse at the deposition of Mr. Shurtleff. For its part, Newhouse served plaintiff with interroga-

tories and a request for admissions. Plaintiff later responded to Newhouse's discovery demands, but in a manner that was objected to by Newhouse.[9] However, beyond this, very little discovery was attempted by WIXT or Newhouse.[10]

The reasons for the protracted discovery is partly attributable to scheduling conflicts and "communication problems" between the parties.[11] The delay was also attributable, at least from plaintiff's point of view, because of its request pursuant to Rule 56(f) of the Fed.R.Civ.P., to stay the Court's decision on Newhouse's summary judgment motion until plaintiff had an opportunity to conduct further discovery, which plaintiff believed would be essential to enable it to adequately oppose Newhouse's motion. In an effort to resolve these problems, plaintiff requested a pre-trial conference. The conference was held on November 29, 1979, and to the Court's surprise, plaintiff withdrew its Rule 56(f) request.[12] Furthermore,

---

7. Fillman, February 12, 1979 affidavit ¶ 5, submitted in support of plaintiff's motion for leave to file and serve amended complaint.

8. Plaintiff's proposed amended complaint further alleges that defendant's violation of the *Noerr-Pennington* doctrine was "continuous and systematic."

9. Newhouse's primary objection was that plaintiff failed to answer Newhouse's interrogatories, and that plaintiff's "responses to Newhouse's request to admit neither admitted nor denied the statements made, but instead stated that plaintiff lacked sufficient knowledge to form the basis for a response." Newhouse Reply Memorandum in Support of Motion for Summary Judgment at p. 6.

10. After concluding the Shurtleff deposition, plaintiff expressed the desire to depose three other WSYR–TV executives, but it did not proceed to schedule or take these depositions. Fillman letters—March 23, 1979; August 6, 1979.

11. *See e. g.* Fillman letters dated March 12, 1979 and March 14, 1979.

12. It appears that plaintiff's statement to the Court at the pretrial conference on its Rule 56(f) request was a rehashing of its position as expressed in an August 6, 1979, letter to the Court from plaintiff's counsel which states in part:

I just thought it inappropriate to burden the parties, and possibly the Court as well, with discovery until after the identity of parties and the nature of the issues to be litigated might be better shaped by the Court's decisions on the pending Motions.

*Compare* Beeching April 9, 1980 affirmation with Fillman letter of April 11, 1980.

Although plaintiff withdrew its request pursuant to Rule 56(f), the Court notes that the *form of plaintiff's motion did not comply with* that Rule's requirements. Rule 56(f) mandates that an opposing party to a summary judgment motion

should present his affidavit showing that the knowledge or control of the facts is exclusively or largely with the moving party and describe his attempts to obtain those facts. The mere averment of exclusive knowledge or control of the facts by the moving party is not adequate: the opposing party must show to the best of his ability what facts are within the movant's exclusive knowledge or control; what steps have been taken to obtain the desired information pursuant to the discovery procedures under the Rules; and that he is desirous of taking advantage of these discovery procedures.

6 J. Moore's Federal Practice § 56.24 at 56–1432 (2d Ed. 1976). *Plaintiff's motion merely* alleges that it desires facts within the control of defendants. It does not describe with particularity how such facts are in defendants' exclusive control, what facts are in question, plaintiff's attempts to obtain these facts, the particu-

plaintiff informed the Court that it would not object to a resolution of the Newhouse summary judgment motion on the basis of the record as it stood at that time. The Court construed plaintiff's statements as a waiver of its right to further discovery.

In any event, on March 4, 1980, the Court contacted attorneys for Newhouse and WIXT and inquired whether they desired the opportunity to conduct further discovery before the Court ruled on the pending motions. Both parties declined the Court's invitation. With this procedural background in mind, the Court will first consider plaintiff's motion to amend its complaint.

## II.

Plaintiff moves to amend its complaint for purposes of clarifying the claims that it made in its original complaint, and to add the Newhouse-owned Herald Company as a defendant co-conspirator. While Meredith does not oppose the amendment of plaintiff's complaint, Newhouse maintains that, even after considering the changes in plaintiff's proposed amended complaint, plaintiff has failed to state a claim upon which relief can be granted, and has failed to demonstrate that there is a sufficient factual basis to support its claims. Newhouse nevertheless concedes that plaintiff's proposed amended complaint differs from the original in its drafting style only, because it "alleges no additional facts which were not before the Court in connection with Newhouse's motion for summary judgment." Newhouse Memorandum in Opposition to Plaintiff's Motion To Amend its Complaint, at p. 2.

■ As a general proposition, leave to amend a complaint "shall be freely given when justice so requires," Rule 15 Fed.R. Civ.P., "and if the plaintiff has at least a colorable grounds for relief, justice does so require unless the plaintiff is guilty of undue delay or bad faith or unless permission

to amend would unduly prejudice the opposing party." *Foman v. Davis*, 371 U.S. 178, 182, 83 S.Ct. 227, 230, 9 L.Ed.2d 222 (1962); *S. S. Silberblatt, Inc. v. East Harlem Pilot Block*, 608 F.2d 28, 42 (2d Cir. 1979). At the same time, "(a) trial court does not abuse its discretion in denying leave to amend a complaint which even as amended would fail to state a cause of action." *Id.*

■ To the extent that plaintiff's proposed amended complaint merely elaborates on its original claims, the Court believes that the interest of justice will be served by granting plaintiff's motion to amend. Since defendant Newhouse admits that it is already familiar with the assertions made in the proposed complaint, it will not be surprised or prejudiced by the additional allegations that plaintiff has proposed. Furthermore, this result is in the interest of completeness and judicial economy. Although Newhouse argues that plaintiff's proposed amended complaint is unsupported by the facts and fails to state a claim upon which relief can be granted, these matters can best be considered in the context of the motions to dismiss and for summary judgment. Accordingly, plaintiff's motion to amend its complaint is granted, and the amended complaint will serve as the basis for the analysis of defendants' motions. The Court will next examine defendant Newhouse's motion for summary judgment.

## III.

Plaintiff's complaint alleges three claims under Section 1 of the Sherman Act: first, that Newhouse and Herald have operated a reciprocal advertising arrangement; second, that Newhouse and Meredith have conspired to interfere with WIXT's ABC affiliation by boycotting plaintiff; and third, that Newhouse and Meredith have conspired to deny WIXT access to various government agencies. Newhouse has moved for summary judgment with respect to each of plaintiff's claims on the grounds

lar persons plaintiff wants to depose or the specific issues on which plaintiff seeks to examine such persons. *See First National Bank v. Cities Service*, 391 U.S. 253, 298, 88 S.Ct.

1575, 1597, 20 L.Ed.2d 569 (1968); *Person v. New York Post Corp.*, 427 F.Supp. 1297, 1307–08 (E.D.N.Y.), *aff'd*, 573 F.2d 1294, (2nd Cir. 1977).

that WIXT has not marshaled sufficient facts to show that triable issues of fact exist.

## A. Summary Judgment

 Summary judgment attains procedural significance by permitting the court to pierce sham claims and resolve actions where the facts are undisputed, and the moving party is entitled to judgment as a matter of law. *Applegate v. Top Associates, Inc.*, 425 F.2d 92, 96 (2d Cir. 1970); *American Mfrs. M. I. Co. v. American Broadcasting-Pars. Th.*, 388 F.2d 272, 278 (2d Cir. 1967). On a motion for summary judgment, the court is not to try issues of fact, rather, it is only to determine whether triable issues exist. *Id.* at 279. In making this determination, the court must "resolve all ambiguities and draw all reasonable inferences in favor of the party against whom summary judgment is sought," *United States v. Diebold, Inc.*, 369 U.S. 654, 655, 82 S.Ct. 993, 994, 8 L.Ed.2d 176 (1962). This is not to say that the party opposing summary judgment is free of all procedural obstacles. On the contrary, the opposing party "must do more than whet the curiosity of the court" with its claims. "[H]e must support vague accusation and surmise with concrete particulars" and show that there is a genuine issue as to any material fact. *Applegate v. Top Associates, Inc., supra*, 425 F.2d at 96. To some extent, however, this procedural devise relies less upon scientific precision than upon the "informed and properly reasoned judgment" of the court. *American Mfrs. M. I. Co. v. American Broadcasting-Para. Th., supra*, 388 F.2d at 279.

 The primary burden of proof in a summary judgment motion is on the moving party, *Adickes v. S. H. Kress & Co.*, 398 U.S. 144, 157–61, 90 S.Ct. 1598, 1608–10, 26 L.Ed.2d 142 (1970). Once this burden has been met, the nonmoving party can avoid an adverse judgment only by bringing forth evidentiary support for its claims. Fed.R. Civ.P. 56(e); *First National Bank v. Cities Service Co.*, 391 U.S. 253, 299, 88 S.Ct. 1575, 1597, 20 L.Ed.2d 569 (1968). The standard for summary judgment has been summarized in the following manner:

[s]ummary judgment . . . can be sustained . . . if but only if the reviewing court is satisfied that a properly instructed jury, giving full weight to plaintiff's evidence, drawing every reasonable inference in its favor, and subjecting defendants' evidence to a critical eye, could not rationally have found that plaintiff was entitled to any relief.

*Nifty Foods Corp. v. The Great Atlantic & Pacific Tea Co., Inc.*, 614 F.2d 832, 839 (2d Cir. 1980). *Ambook Enterprises v. Time, Inc.*, 612 F.2d 604, 611 (2nd Cir. 1979).

Antitrust actions are not well suited to a summary disposition. The issues involved are usually complex, *Poller v. Columbia Broadcasting*, 368 U.S. 464, 473, 82 S.Ct. 486, 491, 7 L.Ed.2d 458 (1962), and a plaintiff has often been unable to complete discovery in advance of the motion, and is therefore hampered in putting forth "facts" showing the necessity of trial. Cf. *First National Bank v. Cities Service*, 391 U.S. 253, 290–298, 88 S.Ct. 1575, 1593–1597, 20 L.Ed.2d 569 (1968); *Miracle Mile Associates v. City of Rochester*, 617 F.2d 18, 21 (2d Cir. 1980); *George C. Frey Ready-Mixed Con. v. Pine Hill C. M.*, 554 F.2d 551, 555 (2d Cir. 1977). *See generally* 2 Areeda and Turner, *Antitrust Law* § 317 (1978).

 While courts must be mindful of the predicament faced by an antitrust plaintiff at the early stages of the litigation, and that, at times, summary judgment may be "too blunt a weapon with which to win the day," *Miller v. General Outdoor Advertising Co.*, 337 F.2d 944, 948 (2d Cir. 1964), "summary judgments have a place in the antitrust field . . . ." *White Motor Co. v. United States*, 372 U.S. 253, 259, 83 S.Ct. 696, 700, 9 L.Ed.2d 738 (1963). For instance, when a case involves a per se violation of the antitrust laws, summary judgment may be an appropriate means of eliminating unsubstantiated claims. *Id.* On the other hand, where motive and intent are at issue, or the proof is in the hands of the moving party, then summary judgment will rarely be granted because a plaintiff has not as yet had a fair opportunity to conduct the necessary discovery. *Poller v.*

*Columbia Broadcasting, supra,* (motive and intent); *Norfolk Monument Co. v. Woodlawn Memorial Gardens, Inc.,* 394 U.S. 700, 89 S.Ct. 1391, 22 L.Ed.2d 658 (1969) (control of the proof). At the same time, courts must appreciate that a plaintiff may commence an antitrust action to redress injuries "resulting from normal business hazards," *Poller v. Columbia Broadcasting,* 368 U.S. 464, 82 S.Ct. 486, 7 L.Ed.2d 458 (1962) (Mr. Justice Harlan, dissenting), as opposed to unfair competition.[13] Also to be considered is the usually time consuming and expensive nature of antitrust litigation. *Lupia v. Stella D'Oro Biscuit Co., Inc.,* 586 F.2d 1163, 1167 (7th Cir. 1978) *cert. denied* 440 U.S. 982 (1979); *Coninglio v. Highway Services, Inc.,* 495 F.2d 1286, 1293 (2d Cir. 1974); *Laurie Visual Etudes v. Cheesebrough-Pond's, Inc.,* 473 F.Supp. 951, 953 (S.D.N.Y. 1979). With these principles in mind, the Court will now examine plaintiff's reciprocity claim.

### B. Reciprocity

#### 1. Facts

The factual basis of plaintiff's reciprocity claim is not substantially in dispute, and can be summarized as follows. Sometime prior to 1974, Newhouse's television station, WSYR, entered into a "reciprocal" advertising arrangement with Newhouse's newspaper affiliate, the Herald Company. In accordance with that arrangement, the Herald newspapers agreed with WSYR to advertise WSYR's television programs in exchange for television advertising time used to promote one or more of the Herald newspapers. For a variety of reasons, the advertising arrangement increased the operating efficiency, and ultimately the profitability of WSYR. First of all, most if not all of the commercials for the Herald newspapers were aired during WSYR's "unsold" commercial broadcast time. Generally, all commercial television stations have unsold commercial broadcast time from which they are unable to realize any revenues.[14] Should the television station be able to broadcast a commercial during an "unsold" period, the incremental cost involved is minimal, since additional facilities or personnel are not required. Thus, the WSYR and Herald arrangement took advantage of this cost efficiency to increase WSYR's profit.

Moreover, the exchange of television commercial for newspaper advertising is in the true sense of the term an exchange—WSYR and Herald do not pay for this advertising in cash.[15] Instead, WSYR and Herald would keep a general accounting of the amount of advertising they exchanged such that, during the course of the year, the dollar value of the exchange would be comparable.[16] In a typical year, the amount of advertising exchanged between the companies approximated $170,000.00.[17]

The third source of increased profit to WSYR as a result of this advertising arrangement was its effect on WSYR's "ratings." To back up for a moment, the revenues of a commercial television station derive principally from the sale of commercial

---

13. Although we have not collected statistics on the matter, reading antitrust cases over the years leaves us with the impression that a disproportionate share of the summary disposition issues arise in suits by unhappy competitors, displaced customers or suppliers, terminated dealers, or displeased buyers. 2 Areeda & Turner, *Antitrust Law* § 317 at p. 76 (1978). *See also Weiss v. Willow Tree Civic Assn.,* 467 F.Supp. 803, 819 (S.D.N.Y.1979).

14. Carl Jaquint, vice-president and general manager of WIXT, February 11, 1979 affidavit at pp. 6–7.

15. At times, checks were issued by WSYR to Herald for the newspaper advertising, but this would occur only when NBC paid for the advertising. David Shurtleff, vice-president and general manager of WSYR–TV–AM–FM, deposition at pp. 19–21.

16. "There was never any set number of ads either to be placed by us in the newspaper or any number of announcements to be placed by the newspaper on our station. We just merely tried to keep it on an even keel." *Id.* A similar arrangement also existed between WSYR–AM–FM and Herald, and WSYE–TV in Elmira, New York, and Herald. *Id.*

17. *Id.* at 48.

broadcast time to advertisers.[18] In the case of WIXT, for instance, approximately forty-five percent of its revenues come from national advertisers and approximately forty percent derive from local advertisers. The price charged by a commercial television station for its advertisements are based upon audience estimates and station audience penetration data as set forth in rating books compiled by the Arbitron and A.C. Nielson Companies. These rating books are published four times a year, and they contain information about the number and demographic characteristics of television viewers in particular geographic markets, which are distilled from surveys of a statistically-relevant sample taken during four different four-week periods during the year. The rating given to a television station for a designated portion of its broadcast day is used to determine the dollar amount that an advertiser will be required to pay for a commercial broadcast at or around that time. As a corollary to this rule, the television stations with the highest ratings, get the larger share of the advertising business, and consequently are more profitable.

During the rating months, commercial television stations, attempt to boost their ratings with the aid of their network affiliations.[19] One method used is called "stunting," whereby the networks broadcast what they believe will be an exceptionally popular program.[20] To draw attention to such programs, the local affiliated television station will increase its advertising for these special programs to influence potential viewers to watch the programs. If a television station is successful in influencing the public to view its programs, this tends to

increase its audience share or market penetration, and the profitability of the station.[21] Utilizing its special advertising arrangement with Herald, WSYR increased the volume of newspaper advertisements of its programs during the rating months[22] in an effort to improve its profits.

To support its Section 1 reciprocity claim, WIXT complains that Herald "refused"[23] it the opportunity to use an advertising exchange arrangement similar to the one employed by WSYR. The alleged refusal to deal was not, however, absolute, as plaintiff avers that it had entered into such an advertising arrangement with Herald, which, comparatively, amounted to five percent of the volume of advertising placed by WSYR with Herald.[24] Because WIXT was not more often able to use such an advertising arrangement with Herald, it had to divert funds that would otherwise be usable in the development of its business to pay for its advertisements in the Herald newspapers. In addition, plaintiff says that the WSYR-Herald advertising arrangement enabled WSYR to publicize its station and programing at less cost and to a significantly greater extent than WIXT;[25] particularly during those months when increased publicity is likely to affect television station ratings. Plaintiff asserts that, as a result, more viewers watched WSYR programing thereby enabling it to attract greater advertising patronage, to charge more for its advertising, and to become more profitable than WIXT. Finally, plaintiff claims that since WSYR is a dominant seller of television advertising in Syracuse, New York, the WSYR-Herald "reciprocal" advertising arrangement has allegedly enhanced WSYR's market power.[26]

---

18. The following description of the television rating system is taken from the Jaquint February 11, 1979 affidavit at pp. 3–7.

19. David Shurtleff, deposition at p. 69.

20. *Id.* at 74.

21. Jaquint February 11, 1979 affidavit at p. 6.

22. Shurtleff deposition at pp. 66–69.

23. Jaquint February 11, 1979 affidavit at p. 7.

24. *Id.*

25. See plaintiff's exhibit # 6.

26. Plaintiff's amended complaint "" 16–18. *Plaintiff also alleges that* "Newhouse may use revenues derived from sources other than its Syracuse television station to finance the promotional and other activities of that station and to acquire syndication programming, foreclosing plaintiff from acquiring such programming." *Id.* at ' 17.

Relying upon these ·allegations, plaintiff maintains that Newhouse, through its affiliates WSYR and Herald, has conspired to restrain trade or commerce by using a reciprocal advertising arrangement in violation of Section 1 of the Sherman Act. Newhouse disputes that allegation and argues that the WSYR-Herald advertising arrangement is "immune from attack" under Section 1, and cites the case of *Syracuse Broadcasting Corporation v. Newhouse*, 319 F.2d 683 (2d Cir. 1963). In particular Newhouse contends that the advertising arrangement in question is not a conspiracy to restrain trade or commerce, and that there is no issue to be tried on this matter. Thus, Newhouse believes that it is entitled to summary judgment dismissing this portion of plaintiff's complaint. The Court will first address defendant's arguments.

### 2. Conspiracy

To avoid summary judgment dismissing its Section 1 Sherman Act claim, plaintiff must demonstrate that triable issues of fact exist, and that the defendants are not entitled to judgment as a matter of law [27] on any of three essential elements: first, that defendants entered into a "contract, combination ... or conspiracy," second, that such contract, combination or conspiracy was "in restraint of trade or commerce among the several States," and third, that plaintiff suffered economic injury based on the foregoing. 15 U.S.C. § 1. *Fuchs Sugars & Syrups, Inc. v. Amstar Corp.*, 602 F.2d 1025, 1029–30 (2d Cir.) *cert. denied* in 444 U.S. 917, 100 S.Ct. 232, 62 L.Ed.2d 17 (1979); *Modern Home Institute Inc. v. Hartford Acc. & Ind. Co.*, 513 F.2d 102, 108–09 (2d Cir. 1975); *House of Materials, Inc. v. Simplicity Pattern Co.*, 298 F.2d 867, 870 (2d Cir. 1962); *DuPont Glore Forgan Inc. v. Am. Tel. & Tel. Co.*, 437 F.Supp. 1104 (S.D.N.Y.1977) *aff'd* 578 F.2d 1367 (2d Cir.) *cert. denied* 439 U.S. 970, 90 S.Ct. 465, 58 L.Ed.2d 431 (1978); *Beckman v. Walter Kidde & Co.*, 316 F.Supp. 1321, 1324 (E.D.N.Y.1970) *aff'd* 451 F.2d 593 (2d Cir. 1971), *cert. denied* 408 U.S. 922, 92 S.Ct. 2488, 33 L.Ed.2d 333 (1972).

On the issue of conspiracy, the Supreme Court consistently held that common ownership and control of corporations will not insulate them against antitrust liability. *See e. g., United States v. Citizens & Southern National Bank*, 422 U.S. 86, 116–17, 95 S.Ct. 2099, 2016–17, 45 L.Ed.2d 41 (1975); *Perma Life Mufflers, Inc. v. International Parts Corp.*, 392 U.S. 134, 141–42, 88 S.Ct. 1981, 1985, 1986, 20 L.Ed.2d 982 (1968); *Timken Roller Bearing Co. v. United States*, 341 U.S. 593, 598, 71 S.Ct. 971, 974, 95 L.Ed. 1199 (1951); *Kiefer-Stewart Co. v. Joseph E. Seagram & Sons, Inc.*, 340 U.S. 211, 215, 71 S.Ct. 259, 261, 95 L.Ed. 219 (1951); *United States v. Yellow Cab Co.*, 332 U.S. 218, 227, 67 S.Ct. 1560, 1565, 91 L.Ed. 2010 (1947). Still, the mere fact that two or more commonly owned and controlled companies act together for their own self-interest does not necessarily have antitrust consequences. It is only when these companies, through concerted actions, "attempt to exact some collateral anticompetitive advantage" will they run afoul of the antitrust laws. *Fuchs Sugars & Syrups, Inc. v. Amstar Corp., supra*, 602 F.2d at 1025; *Knutson v. Daily Review Inc.*, 548 F.2d 795, 802 (9th Cir. 1976) *cert. denied* 433 U.S. 910, 97 S.Ct. 2977, 53 L.Ed.2d 1094 (1977); *Bowen v. New York News, Inc.*, 522 F.2d 1242, 1254 (2d Cir. 1975) *cert. denied* 425 U.S. 936, 96 S.Ct. 1667, 48 L.Ed.2d 177 (1976).

This rule recognizes that, as a practical matter, commonly owned companies will naturally tend to reach understandings among themselves in order to secure commercial advantages. Yet, it would defeat the purpose of free competition, and subject the multicorporate form to unnecessary restrictions, if the courts construed Section 1 of the Sherman Act as defining a "conspiracy in restraint of trade" to include every joint action by commonly owned companies." *Joseph E. Seagram & Sons, Inc. v. Hawaiian Oke & Liquors, Ltd.*, 416 F.2d 71, 84 (9th Cir. 1969); *Murphy Tugboat v. Shipowners & Merchant Towboat*, 467 F.Supp.

27. *See supra*, at pp. 1011–1012.

841, 860 (N.D.Cal.1979); Wills & Pitofsky, *Antitrust Consequences of Using Corporate Subsidiaries*, 43 N.Y.U.L.Rev. 20, 20–30 (1968). Thus, for example, where one corporate affiliate, in granting another affiliate free advertising benefits, merely affects a redistribution of corporate profits, this practice is not a conspiracy in restraint of trade. *Syracuse Broadcasting Corp. v. Newhouse*, 319 F.2d 683, 687 (2d Cir. 1963). At the other end of the spectrum, however, where jointly owned companies, through the use of restrictive sale agreements, unreasonably foreclose their competitors from access to market, such actions violate Section 1 of the Sherman Act. *United States v. Yellow Cab Co.*, 332 U.S. 218, 67 S.Ct. 1560, 91 L.Ed. 2010 (1947). In sum, concerted action by jointly owned entities which is motivated by legitimate business purposes is protected conduct under the Sherman Act. And yet, concerted action by those same entities, which creates an anticompetitive effect will likely be viewed as a conspiracy in restraint of trade. *See Murphy Tugboat v. Shipowners & Merchants Towboat, supra* at pp. 858–60; *DuPont Glore Forgan Inc. v. Am. Tel. Co., supra* at 1115–16; Sullivan, *Antitrust Law* 323–28 (1977); 1 Von Kalinowski, *Antitrust Laws and Trade Regulation* § 6.01(2) at pp. 6–32–6–41 (1979).

Newhouse claims that for antitrust purposes, the advertising arrangement at issue in the present case falls on the side of a legitimate business practice, and is therefore not a conspiracy in restraint of trade. In support of this argument, defendant relies principally on the Second Circuit Court of Appeals opinion in *Syracuse Broadcasting Corp. v. Newhouse*, 319 F.2d 683 (2d Cir. 1963). The *Syracuse Broadcasting* case involved twelve years of litigation, including four separate appeals to the Second Circuit. The action was commenced by the Syracuse Broadcasting Corporation which operated radio station WNDR in Syracuse, New York. Named as defendants were Samuel I. Newhouse, who directly or indirectly owned the three corporate defendants, the Herald Company, the Post-Standard Company, and the Central New York Broadcast-

ing Company, a company that operated WSYR television and radio stations. Plaintiff alleged primarily that defendants conspired to grant WSYR disproportionate publicity in their newspapers, in violation of Section 1 of the Sherman Act. It was also claimed by plaintiff that defendants violated the Act by giving free newspaper advertising to WSYR and its advertisers without making the same opportunity available to WNDR.

In the final appeal on the latter issue, the Court of Appeals assumed that plaintiff presented sufficient evidence to prove that the newspapers had given free advertising to WSYR. 319 F.2d at 687. Nevertheless, the Court rejected plaintiff's claim that defendants were involved in a conspiracy to restrain trade. To begin with, the Court of Appeals followed the Supreme Court's admonition that the Sherman Act "is aimed at substance rather than form." *Citing United States v. Yellow Cab Co.*, 332 U.S. 218, 227, 67 S.Ct. 1560, 1565, 91 L.Ed. 2010 (1947). The Court then stated further:

> Looking at the substance of the transactions here, it is apparent that any free advertising, if given, merely affected a redistribution of corporate profits. There is nothing to indicate that WSYR could not have paid for its advertising. If it had paid for the advertising, the newspapers would have received additional revenue; if it did not pay, its own revenues would have been correspondingly increased. Therefore, the granting of free advertising is as equally probative of a corporate policy of leaving certain funds in one corporation rather than transferring them to the books of another as it is of a conspiracy to restrain trade. There is nothing to indicate that requiring WSYR to pay for its advertising would in any way have aided plaintiff in competing with WSYR.

*Id.* at 689. The common ownership of the defendants was not, however, dispositive of this issue. *Id.*

The present case differs only slightly from the facts of *Syracuse Broadcasting*. Here, defendants' uncontroverted evidence

reveals that WSYR pays for its advertising through a barter arrangement with the Herald newspapers, as opposed to the free advertising arrangement that the Herald Company had provided to WSYR in the *Syracuse Broadcasting* case. Nonetheless, in *Syracuse Broadcasting* the Court of Appeals was not persuaded that the availability of free advertising was sufficiently anticompetitive to be characterized as a conspiracy in restraint of trade. There is greater justification for this same conclusion in the instant case because the defendants' barter advertising arrangement is even less advantageous than the free advertising considered in *Syracuse Broadcasting*. Furthermore, just as in *Syracuse Broadcasting*, there is no evidence in this case tending to demonstrate that WSYR was required by Newhouse to accept the advertising exchange rather than engaging in a cash transaction. Indeed, in its amended complaint plaintiff concedes that the combined resources of Newhouse enable it to reap the benefit of "promotional and other activities" which are beyond the financial means of WIXT, and put it at a disadvantage in competing with WSYR. Thus, the use of a barter advertising arrangement cannot fairly be isolated as the reason for WIXT's weaker position in the Syracuse television advertising market.

Furthermore, even viewing the evidence most favorably to plaintiff, it does not appear that the barter advertising arrangement between WSYR and Herald is anything but a means by which legitimate business efficiencies are obtained. In this sense, the present case is no different than the free advertising agreement considered in *Syracuse Broadcasting*. The exchange of advertising between WSYR and Herald only produces a temporary increase and decrease in corporate revenue, which are equalized between the corporations by the end of the year. Therefore, as in *Syracuse Broadcasting*, the use of this advertising arrangement "is equally probative of a corporate policy of leaving certain funds in one corporation rather than transferring them to the books of another as it is of a conspiracy to restrain trade." 319 F.2d at 687. As

such, the defendants' barter advertising arrangement is a business practice intrinsically related to common corporate ownership, which fails to produce the anticompetitive effect condemned by the Supreme Court as conspiracies in restraint of trade. *See e. g., Timken Co. v. United States*, 341 U.S. 593, 71 S.Ct. 971, 95 L.Ed. 1199 (1951); *United States v. Yellow Cab*, 332 U.S. 218, 67 S.Ct. 1560, 91 L.Ed. 2010 (1947). Moreover, the fact that plaintiff was denied access to a similar credit advertising arrangement, does not undermine the principle that the antitrust laws permit corporate affiliates to act in their own self-interest by setting their own terms, and by dealing in the marketplace with whomever they choose. *United States v. Colgate & Co.*, 250 U.S. 310, 39 S.Ct. 465, 63 L.Ed. 992 (1919); *Beckman v. Walter Kidde & Company*, 316 F.Supp. 1321, 1326 (S.D.N.Y.1970). Mere inequality of treatment by a corporation towards its competitors has yet to become a violation of the antitrust laws.

Despite these significant distinctions, plaintiff argues that *Syracuse Broadcasting* is applicable because in that case the Court of Appeals in that case reversed the district court and held that the defendants should not have been granted summary judgment on plaintiff's Section 1 claims. Consequently, plaintiff WIXT argues that summary judgment would be equally inappropriate in this case. The Court does not agree. The key to understanding why the Court of Appeals held that the lower court erred in granting the defendants' Section 1 claim lies in the following statement by the Court: "[t]he record before us here (more than 600 pages) is far too confused and cumbersome to warrant an affirmance of the summary judgment granted on this phase of the case." *Syracuse Broadcasting Corp. v. Newhouse*, 236 F.2d 522 at 526 (2nd Cir.). Plaintiff seems to suggest that it is entitled to create any equally burdensome record before the Court disposes of defendant's motion for summary judgment. This Court is, however, not concerned with the quantity of the record, but with its quality. In fact, plaintiff has had ample opportunity

to seek discovery from Newhouse, but has failed to do so. Moreover, plaintiff has waived its right to further discovery, and has asked the Court to decide all of the defendants' motions based on the record as it presently exists. The issue therefore becomes whether plaintiff has shown that triable issues exist with respect to material facts surrounding its claims that the defendants' barter advertising agreement constitutes a conspiracy. The evidence before the Court proves the existence of the barter agreement. The evidence does not, however, reveal triable issues of fact with respect to the anticompetitive effects of that agreement. To the contrary, the barter advertising agreement is an example of a legitimate business efficiency and for this reason can not amount to a conspiracy in restraint of trade. *See Syracuse Broadcasting Corp. v. Newhouse*, 319 F.2d at 687. The next issue that will be examined, and one which overlaps the conspiracy question, is whether the barter advertising arrangement is restraint of trade.

### 3. Restraint of Trade

 Plaintiff claims that defendants' barter advertising arrangement qualifies as a "per se" violation of Section 1 of the Sherman Act because it amounts to nothing more than reciprocal dealing. To place this claim in its proper context, a brief examination of the history of the Act is in order. The Sherman Act was enacted in 1891, at a time when the public had developed great concern about the negative effects of rapid industrialization. For example, an outgrowth of this industrial expansion was the forming of corporate combinations under a common ownership. These combinations or "trusts" were highly distrusted by the public, who perceived the economic power possessed by these entities as dangerous to society as a whole. In fact, the trusts were using their wealth and power to fix prices, restrict production, divide markets, eliminate smaller competitors, and to restrain and monopolize trade. *Standard Oil Co. v. United States*, 221 U.S. 1, 52, 31 S.Ct. 502, 512, 55 L.Ed. 619 (1911); 1 Von Kalinowski, *Antitrust Laws and Trade Regulation* § 3.02[1] at 3–46–47. Thus in proscribing

"Every contract, combination in the form of trust or otherwise, or conspiracy in restraining of trade or commerce . . . ," Section 1 of the Sherman Act was designed to restore the principle of free competition to the marketplace.

 As interpreted by the Supreme Court, however, Congress had not intended Section 1 to eliminate every "contract, combination or conspiracy" in restraint of trade. In *Standard Oil Co. v. United States*, 221 U.S. 1, 58, 31 S.Ct. 502, 515, 55 L.Ed. 619 (1911), the Supreme Court, upon reviewing the legislative history of the Act, and common law rules relating to restraints of trade and monopolies, stated the following:

> the dread of enhancement of prices and of other wrongs which it was thought would flow from the undue limitation or competitive conditions caused by contracts or other acts of individuals or corporation, led, as a matter of public policy, to the prohibition or treating as illegal all contracts or acts which were *unreasonably restrictive* [emphasis supplied] of competitive conditions, either from the nature of character of the contract or act or where the surrounding circumstances were such as to justify the conclusion that they had not been entered into or performed with the legitimate purpose of reasonably forwarding personal interest and developing trade, but on the contrary were of such a character as to give rise to the inference or presumption that they had been entered into or done with the intent to do wrong to the general public and to limit the right of individuals, thus restraining the free flow of commerce and tending to bring about the evils, such as enhancement of prices, which were considered to be against public policy.

This formulation of Section 1 is known as the "rule of reason," and it requires a court to weigh all the factual circumstances of a case in determining "whether a restrictive practice should be prohibited as imposing an unreasonable restraint on competition." *Continental T.V., Inc. v. GTE Sylvania, Inc.,*

433 U.S. 36, 49, 97 S.Ct. 2549, 2557, 53 L.Ed.2d 568 (1977); *United States v. Topco Assocs., Inc.*, 405 U.S. 596, 606–607, 92 S.Ct. 1126, 1132–33, 31 L.Ed.2d 515 (1972).[28]

In *Standard Oil*, the Court even went a step farther. In addition to announcing its "rule of reason," the Court isolated certain anticompetitive practices which, by their very nature, are presumed to be illegal. The rationale behind this "per se" category of anticompetitive practices was succinctly stated by the Court in *Northern Pac. R. Co. v. United States*, 356 U.S. 1, 5, 78 S.Ct. 514, 518, 2 L.Ed.2d 545 (1958):

> [T]here are certain agreements or practices which because of their pernicious effect on competition and lack of any redeeming virtue are conclusively presumed to be unreasonable and therefore illegal without elaborate inquiry as to the precise harm they have caused or the business excuse for their use. This principle per se unreasonableness not only makes the type of restraints which are proscribed by the Sherman Act more certain to the benefit of everyone concerned, but it also avoids the necessity for an incredibly complicated and prolonged economic investigation into the entire history of the industry involved, as well as related industries, in an effort to determine at large whether a particular restraint has been unreasonble—an inquiry so often wholly fruitless when undertaken. Among the practices which the courts have heretofore deemed to be unlawful in and of themselves are price fixing, *United States v. Socony-Vacuum Oil Co.*, 310 U.S. 150, 210 [60 S.Ct. 811, 838, 84 L.Ed. 1129]; division of markets, *United States v. Addyston Pipe & Steel Co.*, 85 F. 271, aff'd 175 U.S. 211 [20 S.Ct. 96, 44 L.Ed. 136]; group boycotts, *Fashion Originators' Guild v. Federal Trade Comm'n*, 312 U.S. 457 [61 S.Ct. 703, 85 L.Ed. 949]; and tying arrangements, *International Salt Co. v. United States*, 332 U.S. 392 [68 S.Ct. 12, 92 L.Ed. 20].

Moreover, a district court has suggested that reciprocal dealing should also be included in this group when a substantial amount of commerce is affected by such a practice, *United States v. General Dynamics Corp.*, 258 F.Supp. 36, 56, 66–67 (S.D.N.Y. 1966); *see also United States v. Griffith Co.*, 334 U.S. 100, 68 S.Ct. 941, 92 L.Ed. 1236 (1948). Plaintiff asserts that defendants' barter advertising arrangement falls into this latter category.

 As a general rule, reciprocity describes the practice whereby two commercial enterprises condition their relationship on mutual patronage. *United States v. General Dynamics Corp.*, 258 F.Supp. 36, 57 (S.D.N.Y.1966); *accord U. S. v. Airco, Inc.*, 386 F.Supp. 915, 917 (S.D.N.Y.1974); *see generally* Hausman, *Reciprocal Dealing and the Antitrust Laws*, 77 Harv.L.Rev. 873 (1964). Reciprocal dealing typically takes two forms—coercive or voluntary. Coercive reciprocity, is best illustrated by the seller that possesses substantial market power as a buyer and uses its purchasing leverage to improve its market position as a seller. Sullivan, *Antitrust Law* 492 (1977). By contrast, voluntary reciprocity describes the practice whereby two firms agree to condition their relationship on mutual patronage. The Court in *General Dynamics* described this practice as thusly:

> The essence of the arrangement is the willingness of each company to buy from the other, conditioned upon the expectation that the other company will make reciprocal purchases. The goods bought are typically dissimilar in kind, and in the usual case could be obtained from other sources on terms which, aside from the reciprocal purchases, would be no less advantageous. Where such a relationship is well established, it prevents the competitors of each company from selling to the other company, and affords to each company whatever increase in size and strength can be derived from an assured place as supplier to the other.

**28.** While plaintiff complains that the combined resources of Newhouse put plaintiff at a competitive disadvantage, plaintiff does not allege that defendants Newhouse and Herald have violated Section 2 of the Sherman Act.

258 F.Supp. 58–59.[29] In addition, the *General Dynamics* opinion suggests that a "substantial amount of interstate commerce must be disrupted by the reciprocal arrangement before a defendant corporation could be held liable for a reciprocal dealing. The court, then adopted the Supreme Court's assessment in *International Salt v. United States*, 332 U.S. 392, 68 S.Ct. 12, 92 L.Ed. 20 (1947), that $500,000.00 was a "substantial" amount of commerce where tying arrangements were concerned, and held that this figure should serve to guide courts in assessing the extent of commerce affected by reciprocal arrangements.[30] In sum, to prove a claim of reciprocity, a plaintiff must demonstrate that a reciprocal agreement exists, the agreement was coerced with a "reciprocal motivation," or entered into with an understanding that the patronage would be mutual, causing a substantial foreclosure of competitors from the marketplace. *Southern Concrete Co. v. United States Steel Corp.*, 535 F.2d 313 (5th Cir. 1976) *cert. denied* 429 U.S. 1096, 97 S.Ct. 1113, 51 L.Ed.2d 543 (1977); *Ryals v. National Car Rental System, Inc.*, 404 F.Supp. 481 (D.Minn.1975); *United States v. Empire Gas Corp.*, 393 F.Supp. 903, 915 (W.D.Mo. 1975) *aff'd* 537 F.2d 296 (1976) *cert. denied* 429 U.S. 1122, 97 S.Ct. 1158, 51 L.Ed.2d 572 (1977); *U. S. v. Airco*, 386 F.Supp. 915, 917

(S.D.N.Y.1974); *Stavrides v. Mellon National Bank & Trust Company*, 353 F.Supp. 1072, 1079 (W.D.Pa.1973); *United States v. General Dynamics Corp.*, 258 F.Supp. 36, 66 (S.D.N.Y.1966).

Like many legal doctrines, the prohibition against reciprocal dealing is more easily understood than applied. This is especially so in instances such as the present where affiliated corporations are allegedly involved. For although mutual patronage between affiliated corporations may, in the eyes of a less successful competitor, appear to be a "reciprocal dealing," the arrangement may in fact be nothing more than a natural outgrowth of an enterprising management. In the context of contested acquisitions, the Supreme Court has thus stated that: "(a) subsidiary will in all probability deal only with its parent for goods the parent can furnish. That fact, however, does not make the acquisition invalid." *United States v. Steel Co.*, 334 U.S. 495, 523, 68 S.Ct. 1107, 1122, 92 L.Ed. 1533 (1948). This observation is equally applicable here. The underlying concern of the antitrust laws is that agreements may be reached freely, based on the competitive merits of the transaction. Certainly that goal would be ill served if every intracorporate business deal involving mutual patronage were invalidated as reciprocal dealing. To avoid

**29.** The "rule of reason" was perhaps best summarized by Mr. Justice Brandeis in *Chicago Board of Trade v. United States*, 246 U.S. 231, 238, 38 S.Ct. 242, 244, 62 L.Ed. 683 (1918):

The true test of legality is whether the restraint imposed is such as merely regulates and perhaps thereby promotes competition or whether it is such as may suppress or even destroy competition. To determine that question the court must ordinarily consider the facts peculiar to the business to which the restraint is applied; its condition before and after the restraint was imposed; the nature of the restraint and its effect, actual or probable. The history for the restraint, the evil believed to exist, the reason for adopting the particular remedy, the purpose or end sought to be attained, are all relevant facts. This is not because a good intention will save an otherwise objectionable regulation or the reverse; but because knowledge of intent may help the court to interpret facts and to predict consequences.

**30.** The court went on to state:

[w]hile the [coercive] practice certainly is the more offensive, [voluntary] arrangements are equally disruptive of the competitive processes [Reciprocity] transforms substantial buying power into a weapon for 'denying competitors less favorably situated access to the market.' It distorts the focus of the trader by interposing between him and the traditional competitive factors of price, quality, and service an irrelevant and alien factor which is destructive of fair and free competition on the basis of merit. The efficient producer may thereby suffer loss because of circumstances extrinsic to the worth of his product. In this situation, it is relative size and conglomeration of business rivals, rather than economic efficiency, that may determine firm growth and success, and ultimately, the allocation of resources.

*United States v. General Dynamics, Corp.*, 258 F.Supp. at 59. *Accord, Northern Pac. R. Co. v. United States*, 356 U.S. 1, 4, 78 S.Ct. 514, 517, 2 L.Ed.2d 545 (1958).

such an outcome, proof of an allegedly reciprocal arrangement must be carefully scrutinized to distinguish between those agreements which are reached in the true spirit of competition, and those which are illegally conditioned or motivated by a reciprocal design. *United States v. General Dynamics Corp., supra,* 258 F.Supp. at 64; Sullivan, *Antitrust Law* at 494.[31]

■ The Court believes that, even though plaintiff has shown that a barter advertising agreement exists between the defendants, it has failed to demonstrate that triable issues of fact exist with respect to a reciprocal motive, or that this agreement foreclosed plaintiff from television advertising revenues in Syracuse. Specifically, plaintiff complains that:

Herald permits Newhouse to advertise its television station (WSYR–TV) in Herald's newspapers, particularly during rating months, in exchange for commercial broadcast time on Newhouse's Syracuse and Elmira television stations. Accordingly, Newhouse may "pay" for its advertising in Herald's newspapers with commercial broadcast time that could be devoted to public service or other nonincome producing announcements in any event, whereas plaintiff is required to pay for its advertising in Herald's newspapers with funds otherwise usable in the development of its business and is not allowed to use commercial broadcast time in lieu of such funds.

Complaint at ¶ 18. The thrust of plaintiff's allegation seems to be that because it has been denied the benefits of a barter adver-

tising arrangement with Herald it has become the victim of a reciprocal dealing. By itself, however, this claim does little to aid plaintiff's cause. Plaintiff has offered no proof tending to demonstrate that Newhouse and Herald secured or conditioned their mutual patronage on the basis of the barter advertising arrangement. *See United States v. Empire Gas Corp.,* 393 F.Supp. 903, 915 (W.D.Mo.1975); *Stavrides v. Mellon National Bank & Trust Company,* 353 F.Supp. 1072, 1079 (W.D.Pa.1973); *United States v. General Dynamics Corp.,* 258 F.Supp. 36, 66 (S.D.N.Y.1966). Without such proof, defendants' barter advertising arrangement is nothing more than a legitimate business efficiency. After all, Herald owns the only major newspapers in Syracuse, and Newhouse has no practical advertising alternative. Plaintiff has conceded, moreover, that Newhouse purchases significant amounts of advertising, and has the financial ability to do so even without the use of reciprocal dealing.

In addition, plaintiff does not allege, nor has it offered any proof to the effect that, due to the market power of WSYR, the defendants' barter advertising arrangement was intended to, or had the effect of, foreclosing plaintiff from the Syracuse television advertising market.[32] *See Southern Concrete Co. v. United States Steel Corp.,* 535 F.2d 313, 317 (5th Cir. 1976) *cert. denied* 429 U.S. 1096, 97 S.Ct. 1113, 51 L.Ed.2d 543 (1977); *U. S. v. Airco,* 386 F.Supp. 915, 917 (S.D.N.Y.1974). Plaintiff fails to assert that because of the Newhouse-Herald advertising agreement, Herald has not, or would not, purchase advertising on WIXT,

---

**31.** The *General Dynamics* court's finding that reciprocity is a per se violation of Section 1 was based upon an analogy to tying arrangements, 258 F.Supp. at 66. *See generally Times Picayune Publishing Co. v. United States,* 345 U.S. 594, 73 S.Ct. 872, 97 L.Ed. 1277 (1953). *See also* Hausman, *Reciprocal Dealings and the Antitrust Laws,* 77 Harv.L.Rev. 873 (1964). Other courts have found a comparison between the doctrines of reciprocity and tying arrangements useful, if not at times, interchangeable in resolving antitrust litigation. *Spartan Grain & Mill Co. v. Ayers,* 581 F.2d 419, 424 (5th Cir. 1978), *cert. denied,* 444 U.S. 831, 100 S.Ct. 59, 62 L.Ed.2d 39 (1979) ("the labels refer to simi-

lar phenomena"); *Southern Concrete Co. v. United States,* 535 F.2d 313, 317 (5th Cir. 1976) (similar type of analysis is employed in both doctrines).

**32.** Indeed, one frequently cited commentator has suggested that "a number of extraordinary and easily distinguishable arrangements, involving the sharing of business advantages, often do enhance competition and should be treated separately. * * * Other than such sharing of business advantages, only a genuine barter transaction is excusable." Hausman, *Reciprocal Dealing and the Antitrust Laws,* 77 Harv.L.Rev. 873, 875 (1964).

or that WIXT has not, or cannot, purchase advertising in the Herald newspapers. Furthermore, plaintiff does not even assert that the Newhouse and Herald arrangement addressed any limitation on the right of Herald or WIXT to purchase advertising from one another. Neither was plaintiff offered any evidence which might substantiate its claim that the defendants' barter advertising relationship had a substantial effect on interstate commerce. In sum, plaintiff has failed to demonstrate that genuine issues of material fact exist with respect to its claim that the defendants' advertising arrangement was a reciprocal dealing, motivated by a desire to gain or extend Newhouse's control of the Syracuse television advertising market. The Court will now examine the question of plaintiff's claim of an antitrust injury.

### C. Antitrust Injury

In order to state a claim under Section 1 of the Sherman Act, plaintiff "must prove *antitrust* (emphasis in original) injury, which is to say injury of the type the antitrust laws were intended to prevent and that flows from that which makes defendants' acts unlawful." *Brunswick Corp. v. Pueblo Bowl-o-mat, Inc.*, 429 U.S. 477, 489, 97 S.Ct. 690, 697, 50 L.Ed.2d 701 (1977); *GAF Corp. v. Circle Floor Co.*, 463 F.2d 752 (2d Cir. 1972). The Court believes that plaintiff has not shown that it has suffered such an injury. Plaintiff maintains that the WSYR and Herald advertising arrangement has afforded WSYR increased publicity, viewers, and profitability at the expense of WIXT. Still, it has already been mentioned that plaintiff concedes in its amended complaint that Newhouse has substantial revenues at its disposal which enables it to secure promotional advantages unavailable to a smaller competitor such as plaintiff. This being the case, to support plaintiff's allegation that the Newhouse and Herald advertising arrangement was the source of economic injury to plaintiff, it was incumbent upon WIXT to demonstrate how, beyond the resources available to Newhouse, the advertising arrangement in dispute, caused this economic injury. In fact, evidence on this issue was never even presented by plaintiff.

It is well understood that mere conclusory allegations of an antitrust violation will not suffice in defeating a motion for summary judgment. *Coniglio v. Highway Services, Inc.*, 495 F.2d 1286, 1292–93 (2d Cir. 1974). Nor can a plaintiff defeat a summary judgment motion by relying on the Supreme Court's admonition in *Poller v. Columbia Broadcasting System, Inc.*, 368 U.S. 464, 473, 82 S.Ct. 486, 497, 7 L.Ed.2d 458 (1962), that summary judgment may not be the best method to resolve complex antitrust cases. Summary judgment is appropriate to dispose of claims that have not been substantiated "by specific facts showing that there is a genuine issue for trial." Rule 56 Fed.R.Civ.P.; *Applegate v. Top Associates, Inc.*, 425 F.2d 92, 94 (2d Cir. 1970). The Court concludes that even after viewing the evidence most favorably to plaintiff, WIXT has failed to demonstrate that triable issues of fact exist with respect to its claim that the Newhouse-Herald advertising arrangement was a conspiracy in restraint of trade within the meaning of Section 1 of the Sherman Act. Defendant Newhouse is therefore entitled to summary judgment on this issue. The court turns now to the question of whether defendants' Newhouse and Meredith are deserving of summary judgment and dismissal of plaintiff's claim that they conspired to deprive plaintiff of its ABC affiliation.

### IV.

Plaintiff says that its affiliation with ABC is more valuable than an affiliation with the CBS or NBC television networks because of the popular program ratings that ABC has received. In an effort to wrestle the ABC affiliation away from WIXT, plaintiff claims that Meredith and Newhouse conspired to convince the ABC network that WIXT's transmission strength is inferior to the signal of Newhouse or Meredith's local stations. Thus, says plaintiff, "the Complaint alleges classic 'boycott' activity that is *per se* violative of Section 1

of the Sherman Act."[33] Plaintiff does not make clear how Newhouse or Meredith were to ultimately benefit by this conspiracy. Nonetheless, plaintiff argues that evidence of the conspiracy can be found in Newhouse and Meredith's attempt to deny plaintiff access to an Onondaga Zoning Board of Appeals proceeding, in which plaintiff sought to relocate its transmission antenna to an antenna farm where each of defendants' antennas are located.[34] In addition, plaintiff believes that it is inappropriate to require it to come forward with evidence proving its allegations of concerted action, and of attempted interference with its network affiliation, before plaintiff has had the opportunity to complete discovery.

Defendants Newhouse and Meredith argue that these allegations fail to state a claim under Section 1 of the Sherman Act, and have moved for summary judgment and dismissal of this portion of plaintiff's complaint. In support of its motion, Newhouse strenuously denies that it ever made contact with ABC in an effort to deprive WIXT of its network affiliation.[35] Furthermore, Newhouse asserts that plaintiff's complaint states only that Meredith had made or was about to make certain statements to ABC in an effort to obtain the ABC affiliation for itself. According to Newhouse, plaintiff has not established a conspiratorial "meeting of the minds" between Newhouse and Meredith. Indeed, Newhouse maintains that such a conspiracy would defy common sense because it would have nothing to gain by helping Meredith, a competitor, obtain an ABC affiliation. Newhouse likewise argues that there is no reason for Meredith to assist Newhouse in securing the ABC affiliation.

Plaintiff's affidavit in opposition to the summary judgment motion is also criticized by Newhouse as being legally insufficient to avoid dismissal of plaintiff's claim. To oppose Newhouse's motion, plaintiff has submitted an affidavit by Larry Israel, which in part states:

4. Shortly prior to the commencement of this action, I received information from a reliable source in the broadcasting industry that Meredith had approached one or more officials of the ABC Television Network to solicit termination of that Network's affiliation with WIXT. In that connection, I was led to believe that Meredith cited inadequate financial resources on WIXT's part and misstated or exaggerated facts concerning WIXT's antenna and technical transmission capabilities as reasons why ABC should terminate its affiliation with WIXT.

5. Given the information, I then had concerning coordinated activities by Newhouse and Meredith before the Zoning Board of Appeals of the Town of Onondaga with reference to WIXT's application for a variance needed to relocate its antenna, I believed that Meredith's approach to the ABC Television Network as part of a pattern of coordinated and concerted activities by Newhouse and Meredith to impede and interfere with competition by WIXT for television advertising revenues in the Syracuse Market. Israel February, 1979, Affidavit at p. 2–3.

Newhouse claims that this statement is based on hearsay, and is inadequate to raise triable issue of fact in view of Newhouse's denial of any involvement in the alleged attempt to deprive WIXT of its affiliation. However, it finds fault with plaintiff's complaint because it contains no allegation that Newhouse participated in such an effort.

---

33. Plaintiff's Memorandum of Law in Opposition to Defendant Newhouse's Motion for Summary Judgment at p. 14.

34. A more detailed examination of this claim is made in Part V, *infra.*

35. February 17, 1979 affidavit of E.R. Vadenboncoeur, President of Newhouse Broadcasting Corporation. "WSYR–TV is affiliated with the NBC Television Network, and has been for more than 40 years. We have expressed no desire to anyone to change that affiliation." "Neither I nor anyone else acting on behalf of Newhouse has discussed with Meredith Corporation any participation by Newhouse or any joint or common action in an effort to cause a termination of the WIXT–ABC affiliation." *Id.* at p. 2.

Meredith asserts, moreover, that WIXT's complaint is fatally defective because it does not claim that ABC actually changed its affiliation, or even indicated that it would consider changing its affiliation in Syracuse.

In determining whether a conspiracy exists, courts will usually look to the inferences that may fairly be drawn from the behavior of the alleged conspirators, since conspiracies are rarely evidenced by explicit agreements. *American Tobacco Co. v. U. S.*, 328 U.S. 781, 810, 66 S.Ct. 1125, 1139, 90 L.Ed. 1575 (1946); *Michelman v. Clark-Schwebel Fiber Glass Corp.*, 534 F.2d 1036, 1043 (2d Cir. 1976) *cert. denied* 429 U.S. 885, 97 S.Ct. 236, 50 L.Ed.2d 166 (1977). The focal point of such an examination is the concerted objective of the actors. "Where the circumstances are such as to warrant a jury in finding that the conspirators had a unity of purpose or a common design and understanding, or a meeting of minds in an unlawful arrangement, the conclusion that a conspiracy is established is justified." *American Tobacco Co. v. U. S., supra*, 328 U.S. at 810, 66 S.Ct. at 1139. Consciously parallel behavior among actors may be considered as circumstantial evidence that they acted in concert; yet, by itself, this evidence is insufficient to sustain an inference of joint action. *Theatre Enterprises, Inc. v. Paramount Film Distrib. Corp.*, 346 U.S. 537, 540–41, 74 S.Ct. 257, 259, 98 L.Ed. 273 (1954). *Accord First National Bank of Arizona v. Cities Services Co.*, 391 U.S. 253, 286–88, 88 S.Ct. 1575, 1591–92, 20 L.Ed.2d 569 (1968); *United States v. Paramount*, 334 U.S. 131, 142, 68 S.Ct. 915, 922, 92 L.Ed. 1260 (1948); *Interstate Circuit, Inc. v. United States*, 306 U.S. 208, 222, 59 S.Ct. 467, 472, 83 L.Ed. 610 (1939); *Ambook Enterprises v. Time, Inc.*, 612 F.2d 604, 613–618 (2d Cir. 1080); *DuPont Glore Forgan Inc. v. Am. Tel. & Tel. Co.*, 437 F.Supp. 1104, 1112 (S.D.N.Y.1977). However, because consciously parallel behavior may result from the independent competitive interests of two or more corporations, to support an inference of a conspiracy, there must also be some proof that the independent choice was less attractive than concerted action. *Modern Home Institute, Inc. v. Hartford Accident & Indemnity Co.*, 513 F.2d 102, 111 (2d Cir. 1975); *accord Ambook Enterprises v. Time, Inc.*, 612 F.2d 604, 615 (2d Cir. 1980).

In the instant case, plaintiff offers two "facts" which, in its view, supports an inference that defendants Newhouse and Meredith conspired to force the ABC network to "boycott" plaintiff's ABC affiliation. First, Meredith independently approached ABC in an effort to deprive plaintiff of its affiliation, and second, Newhouse and Meredith jointly appeared before a zoning board to deny WIXT a zoning variance which would enable it to improve its transmission facilities. The Court believes that these facts, by themselves, do not demonstrate that a triable issue of fact exists with respect to the conspiracy issue.

The primary weakness in plaintiff's proof is on the issue of an unlawful agreement. Courts have held consistently that the Sherman Act is not violated when a distributer unilaterally attempts to get a supplier to transfer patronage. *Fuchs Sugars & Syrups, Inc. v. Amstar Corp.*, 602 F.2d 1025, 1030 (2d Cir. 1979); *Bowen v. New York News, Inc.*, 522 F.2d 1242, 1254 (2d Cir. 1975) *cert. denied* 425 U.S. 936, 96 S.Ct. 1667, 48 L.Ed.2d 177 (1976); *Seagram & Sons, Inc. v. Hawaiian Oke and Liquors, Ltd.*, 416 F.2d 71, 76 (9th Cir. 1969) *cert. denied* 396 U.S. 1062, 90 S.Ct. 752, 24 L.Ed.2d 755 (1970). Thus, there is little, if any, significance to plaintiff's allegation that Meredith independently attempted to deprive WIXT of its ABC network affiliation. Moreover, as will be explored in greater detail in Section V of this opinion, Newhouse and Meredith's joint appearance before the Onondaga Zoning Board is protected conduct under the First Amendment. In short, when viewed separately, plaintiff's allegations have no illegal effect. This Court cannot conclude that, when examined together, such allegations, even if viewed more favorably to plaintiff, are even circumstantial evidence of an illegal conspiracy.

Plaintiff's complaint also fails to state a claim under the boycott doctrine. In its "classic" form, a boycott is an explicit or tacit agreement whereby firms at one level of the marketplace, such as wholesalers, use their leverage with a supplier common to them to persuade the supplier to boycott a nonmember of the conspiracy. *See Klor's, Inc. v. Broadway-Hale Stores, Inc.*, 359 U.S. 207, 79 S.Ct. 705, 3 L.Ed.2d 741 (1959); *Fashion Originators' Guild of America v. FTC*, 312 U.S. 457, 61 S.Ct. 703, 85 L.Ed. 949 (1941); *National Auto Brokers v. Gen. Motors Corp.*, 572 F.2d 953 (2d Cir. 1978) *cert. denied* 439 U.S. 1072, 99 S.Ct. 844, 59 L.Ed.2d 38 (1979); *Michelman v. Clark-Schwebel Fiber Glass Corp.*, 534 F.2d 1036 (2d Cir. 1976). Because of its inherently anticompetitive nature, a group boycott is considered a per se violation of Section 1 of the Sherman Act. *Klor's Inc. v. Broadway-Hale Stores, Inc., supra. See generally*, Sullivan, *Antitrust Law* 230 (1977). In the present case, plaintiff has neither pleaded or shown that Newhouse or Meredith possess sufficient leverage with the ABC network to induce ABC's termination of WIXT's affiliation. Clearly, the Supreme Court has construed the boycott doctrine as requiring a plaintiff to allege and prove some form of economic coercion on the part of defendants before they will be found to have transgressed Section 1 of the Sherman Act. In *Fashion Guild*, for example, a "guild" comprised of fashion manufacturers combined "to combat, and, if possible, destroy all competition from the sale of garments which are copies of their 'original creations.'" 312 U.S. at 461, 61 S.Ct. at 705. The Court analyzed the competitive harm in such an arrangement as follows:

And among the many respects in which the Guild's plan runs contrary to the policy of the Sherman Act are these: it narrows the outlets to which garment and textile manufacturers can sell and the sources from which retailers can buy (*Montague & Co. v. Lowry*, 193 U.S. 38, 45 [24 S.Ct. 307, 309, 48 L.Ed. 608]; *Standard Sanitary Mfg. Co. v. United States*, 226 U.S. 20, 48–49 [33 S.Ct. 9, 14–15, 57 L.Ed. 107]); subjects all retailers and manufacturers who decline to comply with the Guild's program to an organized boycott (*Eastern States Retail Lumber Dealers' Assn. v. United States*, 234 U.S. 600, 609–611 [34 S.Ct. 951, 953–54, 58 L.Ed. 1490]); takes away the freedom of action of members by requiring each to reveal to the Guild the intimate details of their individual affairs (*United States v. American Linseed Oil Co.*, 262 U.S. 371, 389 [43 S.Ct. 607, 611, 67 L.Ed. 1035]); and has both as its necessary tendency and as its purpose and effect the direct suppression of competition from the sale of unregistered textiles and copied designs (*United States v. American Linseed Oil Co., supra* at 389 [43 S.Ct. at 611]). In addition to all this, the combination is in reality an extragovernmental agency which prescribes rules for the regulation and restraint of interstate commerce, and provides extra-judicial tribunals for determination and punishment of violations, and thus "trenches upon the power of the national legislature and violates the statute."

312 U.S. at 465, 61 S.Ct. at 707. *See also Klor's, Inc. v. Broadway-Hale Stores, Inc., supra*, 359 U.S. at 213, 79 S.Ct. at 710. ("This combination takes from Klor's its freedom to buy appliances in an open market and drives it out of business as a dealer in the defendants' products").

Plaintiff does not claim that it suffered or could have suffered any harm as a result of the alleged boycott of defendants. Without such allegations, this Court cannot conclude that plaintiff's complaint states a claim under the Sherman Act. But even if the Court were to find that plaintiff's complaint did state a claim under the Act, plaintiff has not presented sufficient proof on this issue to defeat a motion for summary judgment. Due to Newhouse's specific denials that it had never participated in a conspiracy to deprive plaintiff of its ABC affiliation, the burden shifted to plaintiff to offer further proof in support of its claim. The affidavit of Mr. Israel hardly is sufficient to enable plaintiff to sustain its burden as it is based entirely on hearsay and

speculation. Pursuant to Rule 56(e) of the Fed.R.Civ.P., "[s]upporting and opposing affidavits shall be made on personal knowledge, shall set forth such facts as would be admissible in evidence, and shall show affirmatively that the affiant is competent to testify to the matters stated therein." When a party submits materials that do not comply with this provision, then they need not be considered on the motion for summary judgment. *Price v. Worldvision Enterprises, Inc.*, 455 F.Supp. 252, 266 n. 25 (S.D. N.Y.1978) *aff'd* 603 F.2d 214 (2d Cir. 1979).[36] In sum, defendant Newhouse is entitled to summary judgment dismissing the boycott claim because there are no genuine issues of fact as to whether it conspired with Meredith to deprive plaintiff of its ABC affiliation. Moreover, plaintiff's complaint fails to state a claim under the conspiracy and boycott doctrines and therefore Meredith's motion to dismiss is granted. The next issue to be examined is plaintiff's claim that Newhouse and Meredith conspired to deny plaintiff access to various administrative agencies in violation of Section 1.

## V.

Plaintiff alleges that Newhouse and Meredith have conspired in contravention of Section 1 of the Sherman Act to block plaintiff from moving its transmission facilities and antenna, by denying WIXT access to the FCC and the Onondaga County Zoning Board. More specifically, plaintiff complains as follows: WIXT's transmitting facilities are located near Pompey, New York, and approximately 12 miles from Syracuse. The facility's distance from Syracuse, and the terrain between it and the city, combine to produce a shadowing of WIXT's transmission to most of the greater Syracuse

viewing audience. Newhouse and Meredith's transmitting signals do not suffer from this problem because they are both located approximately four miles closer to the heavily populated areas of Syracuse than the facilities of WIXT. The different direction of plaintiff's and defendants' transmission facilities is also disadvantageous for plaintiff. Television viewers who aim their antennas to receive WTVH and WSYR's transmission signals will hinder their reception of WIXT's signal because it is located in a different direction. As a result of these factors, WIXT has an inferior signal to those of WTVH and WSYR.[37]

To overcome its signal deficiency, WIXT sought to relocate its transmssion facilities in close proximity to the defendants' antennas at Sentinel Heights. Together with its new antenna, plaintiff planned to install ultramodern transmitting devices and thereby further improve the quality of its signal. However, these changes could not be implemented without approval from the Federal Aviation Agency, and the Federal Communication Commission. It was also necessary for plaintiff to obtain a variance from the Onondaga Town Zoning Board of Appeals. Plaintiff applied for and eventually obtained the FAA's permission for the proposed relocation of plaintiff's antenna. At the same time, plaintiff made an application to the FCC where prompt approval was expected by plaintiffs, in view of the commission's policy to encourage the common location of transmitting towers to minimize transmission problems and possible aviation hazards.

Nevertheless, plaintiff's expectations were not born out by the events that followed. When plaintiff filed its application with the FCC to change the location of its

---

**36.** Plaintiff's discovery argument is without merit. *See supra,* at pp. 1009–1010.

**37.** Plaintiff concedes that its signal is inferior to those of defendants. In a prepared statement before the Onondaga Zoning Board of Appeals, the president of WIXT, Mr. Israel states: "Many of the potential buyers for Channel 9 were discouraged from coming into this community for several reasons. First, it suffered from major competitive disadvantages

in serving this area because of a signal deficiency vis-a-vis its competitors the Newhouse-NBC-Channel 3 affiliate and Meredith CBS-Channel 5 affiliate." Newhouse Exhibits re: Zoning Board of Appeals, Town of Onondaga, Part I. Mr. Charles Mulvey, WIXT's chief engineer also stated: "Without delving into ancient history too far, suffice it to say the technical decision to locate at Pompey, where we now are, was incorrect." *Id.*

existing transmission facility, Meredith filed a "Petition To Deny" plaintiff's request. Meredith's petition raised two objections to the proposed relocation. First, that it would create interference with WTVH's picture in Syracuse. Second, Meredith expressed its concern in the petition that the proposed relocation was not consistent with the provisions of the *Executive Agreement between the United States and Canada on Television Allocations.* Briefly, the purpose of the Agreement is to regulate the power and location of television stations in close proximity to the United States and Canadian border to maximize the technical quality of television broadcasting along the common border. According to Meredith's petition, the relocation of plaintiff's antenna would cause some degree of interference with the signals of the Canadian stations. Meredith suggested that the FCC should conduct a hearing to determine the effect that the relocation of plaintiff's antenna would have, both in terms of "ghosting" and possible violations of the *Executive Agreement.*

In a rebuttal to Meredith's petition, plaintiff characterized Meredith's purpose in filing its petition as "a product of anti-competitive motivation." In its reply, plaintiff reiterated the benefits that would be derived, both by it and by the Syracuse community, should plaintiff's antenna be relocated. Furthermore, plaintiff challenged Meredith's ghosting allegations and denied that the relocation would violate the *Executive Agreement.* Plaintiff also claimed that since the relocation of its antenna was only a "minor" change in facilities, Meredith could not properly file a "Petition To Deny" according to FCC regulations.[38] In any event, plaintiff argued that the petition was filed late and with the intent of delaying the FCC proceeding. Subsequently, Meredith filed a reply to plaintiff's rebuttal and maintained that it delayed filing its "Petition To Deny" because the FCC had not made a decision on the issue of whether the proposed relocation of plaintiff's antenna was a "minor" or "major" change in facilities. In Meredith's reply, it reaffirmed its view that a hearing was in order on the possible negative effects that would be produced as a result of the relocation of plaintiff's antenna. As yet, the FCC has not reached a conclusion on the relocation issue.

In the meantime on May 8, 1978, plaintiff along with the owners of the proposed antenna site, filed a request for a variance with the Onondaga Town Zoning Board of Appeals. Based on documents submitted by Newhouse, there can be no question that defendants Newhouse and Meredith were aware that WIXT was going to make its application to the Zoning Board.[39] These documents also reveal that engineers from Newhouse and Meredith had discussed the possibility of "ghosting" as a result of the proposed relocation of plaintiff's antenna. The engineers generally agreed, if ghosting became a problem, it would impair WTVH's transmission more than WSYR's because the relocated antenna would be situated closer to the WTVH antenna. They were not, however, certain of the extent to which ghosting would actually become a problem. Consequently, Newhouse and Meredith suggested that WIXT should explore the problem before it proceeded with the proposed relocation.

A Zoning Board of Appeals meeting was held on June 6, 1978. Plaintiff testified at the hearing and made an extensive presentation. Its first spokesman was its lawyer, Charles Cooney, who offered various photographs of the proposed relocation site on the antenna, and discussed the environmental impact of the move. Mr. Cooney also represented the owners of the proposed site of the antenna, and read a statement on their behalf to the effect that the property

---

**38.** *See* Section 309(d) of the Communications Act of 1934, as amended, and Section 1.580(i) of the Commission's Rules and Regulations. Only a major change in a station's facilities would entitle an interested party to file a "Petition to Deny."

**39.** Exhibits of Defendant Newhouse, in particular at pp. 8, 10, 11, 13, 16: Newhouse's Summary Judgment Exhibit 1, Script of Ferguson and Parkhurst; January 23, 1979 affidavits of Shurtleff and Parkhurst.

could not be put to a more profitable use than if it was sold to WIXT. Next to testify was Chief Engineer, Charles Mulvey, who stated that the proposed tower would be lower than the others already situated at Sentinel Heights. He further testified that viewer reception would improve if the antenna was relocated and that the proposed relocation would have no adverse environmental impact. The new facilities, according to Mr. Mulvey, would not cause a health hazard in the form of excess microwave radiation, nor was there a possibility that the antenna would fall on neighboring person or property.

Following plaintiff's presentation, representatives and engineers testified on behalf of Newhouse and Meredith. The evidence before this Court suggests that they read from prepared statements, whose content appeared to reflect a prearranged position in qualified opposition to WIXT's request for a variance. First to testify for Meredith was engineer Al Chismark who voiced his fear that the relocation of the WIXT antenna would cause "ghosting" of the other television signals. The next witness to testify was WSYR's chief engineer, Robert Parkhurst, who commented as follows:

> We would not be opposed to this application if we were satisfied that there would be no adverse effect upon WSYR's and WTVH's TV broadcasting signal. I agree with Mr. Chismark, and I can state from my own knowledge and experience that the technology of VHF TV broadcasting is such that signals transmitted on assigned frequencies from different sources have a tendency to reradiate or bounce off each other, producing reflections resulting in 'ghosting.'
>
> I agree with Mr. Chismark that the only solution is for WIXT to provide a full and careful engineering study by a qualified independent, professional, engineer. We believe this should be done before the variance is granted. In the event such a study proves the absence of adverse technical impact upon the existing systems, WSYR–TV would have no

objection to the granting of a use variance to permit the requested WIXT transmission facility. Thank you.

[Parkhurst, Affidavit, Exhibit 1, February 23, 1979].

Also testifying for WSYR was Attorney John Ferguson, who made a brief statement urging "deferral of action on this application pending applicant's submission to the Town Board of a statement for environmental assessment under LOCAL LAW NO. 2 1977 and the New York State Environmental Quality." [January 3, 1979 Affidavit, Exhibit 1].

These objections were then supplemented by the testimony of several local residents who expressed concern that the relocation of WIXT's antenna would cause increased levels of microwave radiation. The residents were also concerned that if plaintiff's antenna ever collapsed it would cause serious, personal injury damage to adjacent property.[40] Once the comments had been exhausted, the hearing was closed, and the applicants were informed that they would be notified of the Board's decision in the mail.

Unfortunately, when the Board attempted to review its tape recording of the June 6th meeting, it discovered that due to a malfunction in recording equipment, none of the comments concerning WIXT's application had been preserved. A new hearing was therefore held on October 3, 1978, and testimony on the variance request was once again taken. On this occasion, Meredith produced three of its engineers who voiced opposition to the WIXT's request solely on the grounds of the potential "ghosting" problem that would be caused by the construction of the WIXT antenna tower. Newhouse, on the other hand, offered no testimony at the second Zoning Board hearing because, according to David Shurtleff, vice-president of Newhouse Broadcasting Corporation, "[b]y the time of the second hearing, we at WSYR–TV had decided that the prospect of interference without signal was not sufficiently serious to warrant par-

---

**40.** Minutes of June 6, 1978, Zoning Board meeting.

ticipation of this hearing and I gave instructions that no representative should appear on behalf of WSYR–TV at the hearing, and none did." [February 23, 1979 Affidavit at p. 3].

For the most part, plaintiff WIXT simply repeated the testimony that it had offered at the June 6th hearing, although the testimony of WIXT's president, Larry Israel, and two experts on microwave radiation were added to plaintiff's presentation. In his testimony, Mr. Israel outlined the benefits that would enure to the Syracuse Community if the tower was relocated. He also suggested that the defendants' opposition might be something less than altruistic:

> our competitors have as their primary motivation, an effort to preclude greater service and to short-circuit competition in this area. Aside from the questions of a free marketplace in which they would be willing to compete, their opposition would short-change the television set owners and viewers in this area and would be a real disservice to this community.

[Prepared testimony at p. 5].

Plaintiff further produced experts on microwave radiation, who testified that the additional antenna would not pose any medical problems to the Sentinel Heights residents. Moreover, WIXT's engineering experts testified that the new antenna would not cause "ghosting" of signals transmitted by WTVH or WSYR. In summarizing WIXT's position with respect to the zoning variance, Mr. Jules Cohn, a consulting engineer for WIXT stated:

> Although the raising of these questions is certainly a legitimate exercise by the citizens of the area, and the competing television stations, detailed analysis of the situation shows that neither matter is a cause of concern.

Record of October 3, 1978 hearing at p. 54.

Also testifying at the hearing was an attorney who represented one-hundred and fifty-two residents of the Town of Onondaga, who collectively opposed WIXT's application for a use variance. These residents were concerned that the property value in the area would be negatively affected by the relocation of WIXT's antenna because potential purchasers would be deterred by the high levels of microwave radiation emitted from the various transmitting facilities. Two experts on the health effects of microwave radiation were also called to testify on behalf of this residents group. Finally, eleven individual residents of the Sentinel Heights area spoke in opposition to the relocation of WIXT's antenna, and then the meeting closed.

On October 31, 1978, the Onondaga Zoning Board of Appeals adopted a resolution denying the use variance on the grounds that the applicants failed to establish "hardship" within the meaning of the Town's zoning ordinance. The Zoning Board found that there were no extraordinary circumstances or conditions that applied to the property in question that did not apply to other property in the zoning district, nor would property interests be negatively affected if the variance was granted. Moreover, the Zoning Board determined that granting the variance would not materially benefit the applicants, but would be contrary to the Town's zoning plan for the area. It also expressed concern that the addition of WIXT's antenna would cause health hazards to the area residents due to increased exposure to microwave radiation. Significantly, the Board's resolution did not mention the testimony or recommendations of WTVH or WSYR.

Plaintiff WIXT, joined by the owners of the proposed relocation site, then commenced an Article 78 proceeding in New York State Supreme Court to review the Zoning Board's decision. Petitioners maintained that the decision was not supported by substantial evidence and that it was arbitrary, capricious, and contrary to law. They additionally claimed that the Board's finding that the land could yield a reasonable return with its present use lacked a rational basis. The Supreme Court, J. Robert Lynch presiding, dismissed the petition insofar as it claimed that the Board's findings were arbitrary, capricious, and contrary to law. The Court found that the Board's determination that the public wel-

fare of the community was endangered by the relocation of WIXT's antenna was a reasonable ground upon which to base its decision denying WIXT's request. Merely because land in the area is subject to similar uses, said the Court, does not undermine the basis of the Board's decision, in that it was reasonable for the Board to avoid the duplication of error. Finally, the Court referred to the Appellate Division the question of the competency of the evidence on subdividing the property, and the effects of microwave radiation, since these issues could not properly be resolved in an Article 78 proceeding.

Relying upon this series of events, plaintiff claims that the Newhouse and Meredith's appearance at the Onondaga Zoning Board of Appeals was pursuant to a prior understanding and agreement whereby each, for the purpose of influencing the Zoning Board to deny plaintiff's application for a variance, was to make the "sham" assertion or suggestion that the proposed relocation of WIXT's facilities would cause "ghosting" problems to the signals of WSYR and WIXT. At the time these assertions were made, plaintiff claims that defendants knew that the relocation of the facilities would not cause any interference with the signals from WSYR. Plaintiff further claims that Newhouse and Meredith induced or encouraged various unnamed co-conspirators to oppose plaintiff's petition to the Zoning Board on the false and "sham" grounds that the proposed relocation would create a hazard to aviation, and that the relocation would cause health hazards in the form of the increased exposure of neighborhood residents to the effects of microwave radiation.

According to plaintiff, defendants' hinderance of WIXT's attempt to improve its competitive position was similar to actions that the defendants had taken with respect to other television competitors in Pittsburgh, Pennsylvania and Orlando, Florida. As such, plaintiff maintains that defendants' conduct was part of a systematic effort to prevent competitors from upgrading their facilities. Plaintiff claims that the defendants' concerted opposition was in-

tended to stifle competition by forcing competitors to expend artificially large sums of money to improve their transmission capacity. In addition, plaintiff says that defendants' opposition to plaintiff's petition before the FCC and the Zoning Board were unjustified.

Plaintiff appears to suggest that Newhouse and Meredith's activities are part of a planned campaign to convince advertisers that there are technical deficiencies in the signal from plaintiff's broadcasting facilities, and that plaintiff will experience substantial delay or failure in overcoming said deficiencies. Purportedly, the defendants also advise advertisers that plaintiff will not increase its share of the Syracuse viewing audience unless these problems are overcome, and that advertisers should not purchase commercial broadcasting time from plaintiff. In sum, plaintiff claims that defendants' conduct is violative of Section 1 of the Sherman Act.

In response, defendants Newhouse and Meredith assert that their conduct is protected by the First Amendment and that plaintiff has therefore failed to state a claim upon which relief can be granted. In particular, the defendants maintain that their alleged actions before the FCC and the Zoning Board were conducted independently and could not rightfully be viewed as conspiratorial, nor as intended to harm WIXT. Moreover, defendants claim that their concern about the "ghosting" problem was genuine, and that even plaintiff's experts conceded as much. On the issue of microwave radiation, Newhouse denies that it made any statements to anyone on this subject, and it maintains that it had no contact with local citizens about opposing WIXT's request on this ground or any other. In addition, defendants claim that plaintiff does not have standing to assert antitrust violations which allegedly took place in localities where plaintiff does not even compete. Thus, argue defendants, plaintiff's claim that defendants' anti-competitive conduct is continuous and systematic is without merit. But more significant, say defendants, is that their appearances

before governmental agencies were a constitutionally protected exercise of the right of free speech and the right to petition for redress of grievances, and is absolutely protected from antitrust attack. A more thorough examination of this issue follows.

▆ While the Sherman Act prohibits conduct in restraint of trade in order to guarantee a competitive marketplace, commercial advantage is often pursued by petitioning judicial and administrative institutions. At times such efforts may be motivated by anticompetitive aims. Although this activity is technically forbidden under the Sherman Act, to some extent it is protected by the First Amendment to the United States Constitution which provides:

> Congress shall make no law ... abridging freedom of speech, or ... the right of the people to peaceably assemble and to petition the government for a redress of grievances.

As a consequence, the courts have been required to accommodate the goals of the Sherman Act and the First Amendment.

The Supreme Court first dealt with this question in *Eastern Railroad Presidents Conference v. Noerr Motor Freight, Inc.*, 365 U.S. 127, 81 S.Ct. 523, 5 L.Ed.2d 464 (1961). The defendants in *Noerr*, twenty-four railroads, a trade association of their presidents, and a public relations firm, were charged with conspiring to restrain trade and monopolize the long distance railroad freight business. Plaintiffs, various truckers and trucking firms, asserted that defendants had engaged in a publicity campaign which was designed to destroy competition; that defendants had used the "third party technique" whereby they hired individuals to appear before governmental agencies to represent themselves as inde-

pendently favoring defendants' views; and that defendants had attempted to influence the passage of legislation which gave them a competitive advantage. The district court held that defendants' publicity campaign was malicious because it was intended only to destroy competition and was fraudulent in the use of the "third party technique", whose only purpose was to destroy plaintiff's good will among its customers and the general public. The court therefore concluded that the publicity campaign had violated the Sherman Act.

▆ The Supreme Court reversed the district court. In so doing, the Court held that the Sherman Act could not be violated by a defendant who merely attempted to influence the passage or enforcement of legislation, even if such laws would produce a monopoly in restraint of trade. *Id.* at 135, 81 S.Ct. at 528. In reaching this conclusion, the Court reasoned that at the cornerstone of our democracy was the ability of the citizenry to influence the government by making their views known. Limiting access to the legislature, said the Court, by imposing antitrust liability would inhibit the defendants' First Amendment right to petition.[41] The Court explained that the importance of maintaining this right to petition was not undermined even when it was being exercised by a defendant competitor with the desire or intent to destroy competition, deceive the public or public officials, or to injure a plaintiff competitor by influencing the passage of legislation that would be financially harmful. However, the Court stated that antitrust liability would be imposed on a competitor if efforts to influence governmental action were nothing more than a "sham" to cover up an attempt to interfere with the business relationships of a competitor.

---

**41.** The Supreme Court also viewed the right to petition as having a beneficial affect on the process of government.

Indeed, it is quite probably people with just such a hope of personal advantage who provide much of the information upon which governments must act. A construction of the Sherman Act that would disqualify people from taking a public position on matters in which they are financially interested would

thus deprive the government of a valuable source of information and, at the same time, deprive the people of their right to petition in the very instances in which that right may be of the most importance to them.

*Id.* at 139, 81 S.Ct. at 530–531. *See generally*, Fischel, *Antitrust Liability For Attempts to Influence Government Action; The Basis and Limits of the Noerr-Pennington Doctrine*, 45 U.Chi.L.Rev. 80 (1977).

The Court reaffirmed this holding in *United Mine Workers v. Pennington*, 381 U.S. 657, 85 S.Ct. 1585, 14 L.Ed.2d 626 (1965), a suit between trustees of the United Mine Workers retirement fund and coal company owners. In the district court, the defendant coal companies had won a verdict on their counterclaim that the union had squeezed smaller mine companies out of operation in order to upgrade the wage levels of the miners. The district court believed that the union's attempt to influence TVA officials and the Secretary of Labor reflected their illegal intent. In reversing the district court, the Supreme Court held that "Noerr shields from the Sherman Act a concerted effort to influence public officials regardless of intent or purpose." *Id.* at 670, 85 S.Ct. at 1593.

The holding of *Noerr* was extended to administrative agencies and the courts in *California Motor Transport Co. v. Trucking Unlimited*, 404 U.S. 508, 92 S.Ct. 609, 30 L.Ed.2d 642 (1972), where the Court further outlined the requirements for stating a claim under the "sham" exception of *Noerr*. The plaintiffs in *California Trucking* were truckers operating in California who alleged that defendants, truckers operating in California and interstate, had orchestrated a campaign to defeat applications by plaintiffs to acquire or transfer their operating rights. What distinguished the allegations of *California Trucking* from *Noerr* and *Pennington* was plaintiffs' assertion that defendants had used their power and influence to deny plaintiffs "free and unlimited access to administrative and judicial tribunals." As part of this conduct, plaintiffs alleged that defendants had commenced proceedings "with or without probable cause, and regardless of the merits of the cases." *Id.* at 512, 92 S.Ct. at 612.

The Court concluded that defendants' conduct was objectionable because its purpose was to "bar their competitors from meaningful access to adjudicatory tribunals and so to usurp that decision-making process," *id.* at 512, 92 S.Ct. at 612, and therefore fell within the "sham" exception outlined in *Noerr*. Looking across the spectrum of political activity, moreover, the

Court found that the use of misrepresentations or unethical conduct in the legislative arena could be tolerated the most for purposes of antitrust liability. *Id.* Underlying this conclusion is the recognition that politics often involves a "no-holds barred fight" and that such conduct is "along lines normally accepted in our political system." *Noerr*, 365 U.S. at 144–145, 81 S.Ct. at 533. In the adjudicatory setting, however, the same conduct has different implications because this process "often results in sanctions." *California Transport, supra* 404 U.S. at 512, 92 S.Ct. at 612. The Court stated further:

> Misrepresentations, condoned in the political arena, are not immunized when used in the adjudicatory process. Opponents before agencies or courts often think poorly of the other's tactics, motions, or defenses and may readily call them baseless. One claim, which a court or agency may think baseless, may go unnoticed; but a pattern of baseless, repetitive claims may emerge which leads the factfinder to conclude that the administrative and judicial processes have been abused. That may be a difficult line to discern and draw. But once it is drawn, the case is established that abuse of those processes produced an illegal result, *viz.*, effectively barring respondents from access to the agencies and courts. Insofar as the administrative or judicial processes are involved, actions of that kind cannot acquire immunity by seeking refuge under the umbrella of "political expression." *Id.* at 513, 92 S.Ct. at 612.

Another example of the application of the "sham" exception in the adjudicatory process is the case of *Otter Tail Power Co. v. United States*, 410 U.S. 366, 93 S.Ct. 1022, 35 L.Ed.2d 359 (1973). The record in *Otter Tail* reveals that, as part of the Power Company's anticompetitive conduct, it instituted lawsuits which had the effect of delaying or halting efforts to establish municipally-owned competitors. Municipal power systems are financed by the sale of bonds. Before the bonds can be sold the town's attorney must submit an opinion which in-

cludes an affirmation that there is no pending or threatened litigation which might impair the value or legality of the bonds. The Otter Tail Power Company would file lawsuits challenging the bonds in order to slow or halt a town's "enthusiasm" for public ownership due to the burden on the treasuries of the targeted towns in defending these actions. In remanding the question to the district court of whether the instigation of such suits fell within the "sham" exception of the *Noerr-Pennington* doctrine, the Supreme Court stated that "the principle of *Noerr* may also apply to the use of administrative or judicial processes where the purpose to suppress competition is evidenced by repetitive lawsuits carrying the hallmark of insubstantial claims and thus is within the 'mere sham' exception announced in *Noerr*." *Id.* at 380, 93 S.Ct. at 1031.

■ To summarize, the First Amendment provides that citizens are entitled to petition the various branches of the government to "make their wishes known." Moreover, the government depends on this flow of information in order to function. It is of no moment that by petitioning the government, the petitioner is motivated by a desire to injure its competition; such conduct, though anticompetitive, is immunized under the First Amendment. There is a limit, however, to this immunity. When the petitioner repetitively abuses the political process through perjury, bribery, or misrepresentation, and this conduct has the effect of barring competitors from access to the governmental process, then no constitutional immunity attaches, and such conduct will be evaluated under the antitrust laws for its anticompetitive impact.

■ In the present case, even construing the facts more favorably toward plaintiff, it has not stated a claim, or demonstrated that triable issues of fact exist with respect to its allegation that defendants' conduct falls within the "sham" exception of the *Noerr-Pennington* doctrine. Plaintiff has not specifically pleaded or shown how it has been denied access to either the FCC or the Onondaga Zoning Board. Actu-

ally, in both instances, it was plaintiff who petitioned these agencies for relief. As for Meredith's action before the FCC, its "Petition To Deny" could hardly be characterized as an obstacle to plaintiff receiving the full benefit of applicable government procedures. Meredith states that its petition was submitted only in the event that the FCC ruled plaintiff's proposed relocation of its transmission facilities to be a "major" change. Thus, if the FCC ruled that the proposal was a "minor" change, Meredith concedes that its petition need not be considered by the FCC.

But even if the FCC ruled that the proposed relocation was a "major" change, Meredith's reasons for objecting to plaintiff's application are far from being a "pattern of baseless, repetitive claims" that plaintiff claims them to be. Even plaintiff's expert admitted that the possible "ghosting" problem caused by the new antenna was a "legitimate concern" to plaintiff's competitors. Moreover, if the *Executive Agreement* argument of Meredith was "sham," plaintiff's complaint has not alleged a reasonable basis for its conclusion, nor has plaintiff bothered to offer supportive proof. Lastly, the FCC has not even ruled on plaintiff's application to relocate its transmission facilities. Thus, the Court cannot conclude that Meredith has denied plaintiff access to the FCC. In fact, plaintiff may still win approval of its application, in which case there would be no basis for its claim that it had been denied access to administrative process. On the other hand, should the application be denied, and Meredith prevails upon the FCC, then plaintiff would be without a legitimate *Noerr-Pennington* claim, since by definition a successful claim cannot be "sham." *Eastern Railroad Presidents Conference v. Noerr Motor Freight, Inc.*, 365 U.S. 127, 144, 81 S.Ct. 523, 533, 5 L.Ed.2d 464 (1961); *Taylor Drug Stores v. Associated Dry Goods*, 560 F.2d 211, 213 (6th Cir. 1977); *Metro Cable Co. v. CATV of Rockford, Inc.*, 516 F.2d 220 (7th Cir. 1975); *Huron Valley Hospital v. City of Pontiac*, 466 F.Supp. 1301, 1315 (E.D.Mich.1979); *Subscription T.V. v.*

*Southern Cal. Theatre Owners*, 576 F.2d 230, 233 (9th Cir. 1978).

At the same time, Meredith's action before the FCC seems tame when compared to the orchestrated publicity campaign that was found to be immunized by the First Amendment in *Noerr*, and tamer still than the facts of *California Transport*. Whether Meredith's intent in filing the "Petition To Deny" before the FCC was to harm WIXT is irrelevant to the instant inquiry. *Noerr, supra*, 365 U.S. 139, 81 S.Ct. at 530; *Pennington, supra*, 381 U.S. at 670, 85 S.Ct. at 1593. What is essential is the principle that the right to petition the government for self-benefit is protected by the Constitution. The mere allegation of denial of access to a governmental agency does not remove this shield, especially where plaintiff has been given every opportunity to pursue its rights before the very same government agency it asserts it has been denied access to.

A similar conclusion is warranted with regards to the defendants' involvement before the Zoning Board of Appeals. The Court assumes for the purpose of this examination that Newhouse and Meredith communicated with each other, and agreed to oppose WIXT's proposed zoning variance. Nevertheless, there is nothing in the record that would suggest that plaintiff was in any fashion denied access to a full consideration of its request for a zoning variance. On the contrary, two complete hearings were held by the Zoning Board, and plaintiff was able to use this fact to its advantage by calling additional witnesses to testify on its behalf at the second Zoning Board meeting.

To the extent that Meredith and Newhouse did not believe that there was a real "ghosting" problem with regard to Newhouse's signal, yet pursued this claim before the Zoning Board, the Court believes that defendants' conduct does not rise to the level of being "sham." Defendants made this argument in the course of exercising their First Amendment rights, and "along lines normally accepted in our political system." *Noerr, supra*, 365 U.S. at 144–45, 81 S.Ct. at 533. Furthermore, the

"ghosting" concerns voiced by defendants were not a factor in the Zoning Board's decision to deny plaintiff a variance. The Zoning Board ruled that plaintiff had not satisfied the hardship or extraordinary circumstances requirement of the zoning ordinance. While the Zoning Board's opinion did show some concern with the new antenna's affect on property values in the area, and on existing levels of microwave radiation, it did not mention the appearances of Newhouse or Meredith and the "ghosting" problem. In sum, there is no causal connection between the denial of plaintiff WIXT's request for a zoning variance and defendants' appearance before the Zoning Board. As such, plaintiff cannot rightfully be heard to complain that defendants' conduct violated the *Noerr-Pennington* doctrine and Section 1 of the Sherman Act. *Franchise Realty Interstate Corp. v. San Francisco Culinary Workers*, 542 F.2d 1076, 1079 (9th Cir. 1976), *cert. denied* 430 U.S. 940, 97 S.Ct. 1571, 51 L.Ed.2d 787 (1977); *Weiss v. Willow Tree Civic Ass'n*, 467 F.Supp. 803, 817 (S.D.N.Y.1979); *Huron Valley Hospital v. City of Pontiac*, 466 F.Supp. 1301, 1314 (E.D.Mich.1979); *Wilmorite Inc. v. Eagan Real Estate, Inc.*, 454 F.Supp. 1124, 1134 (N.D.N.Y.1977). Areeda & Turner, *Antitrust Law* § 204d pp. 49–51. On the contrary, defendants have a right to make "a genuine effort" to influence the government, *Noerr, supra*, 365 U.S. at 144, 81 S.Ct. at 533, but it

> would be destructive of rights of association and of petition to hold that groups with common interests may not, without violating the anti-trust laws, use the channels and procedures of state and federal agencies and courts to advocate their causes and points of view respecting resolution of their business and economic interests vis-a-vis their competitors.

*California Transport, supra*, 404 U.S. at 510–511, 92 S.Ct. at 611–612. The conduct of Newhouse and Meredith before the Zoning Board of Appeals falls well within the protection of these enumerated rights.

Plaintiff's various other arguments are of no aid to its cause. According to

plaintiff, defendants induced or encouraged unnamed co-conspirators to oppose plaintiff's application for a zoning variance on the grounds that plaintiff's new transmission facilities would create health hazards by increasing residents exposure to microwave radiation, and would be a danger to aviation. However, plaintiff has not produced one iota of proof to support this claim. In any event, the Supreme Court in *Noerr* held that the use of the third party technique, "so far as the Sherman Act is concerned, [is] legally irrelevant." 365 U.S. 142, 81 S.Ct. at 532; *see also Wilmorite, Inc. v. Eagan Real Estate, Inc.*, 454 F.Supp. 1124, 1133 (N.D.N.Y.1977), *aff'd*, 578 F.2d 1372 (2nd Cir.), *cert. denied*, 439 U.S. 983, 99 S.Ct. 573, 58 L.Ed.2d 655 (1978). Thus, even assuming that defendants employed this technique in the instant case would not bolster plaintiff's argument that defendants have violated Section 1 of the Sherman Act.

Next, plaintiff claims that defendants' conduct with respect to plaintiff in opposing its efforts to improve its facilities is similar to actions of defendants in opposing the improvement of competitors' facilities in Pittsburgh and Orlando. Plaintiff asserts that when taken together with the instant case, defendants' actions are part of a systematic conspiracy to interfere with their competitors by opposing the applications of said competitors before governmental agencies without probable cause. The purpose of the conspiracy, according to plaintiff, is to create a drain on the funds and manpower of defendants' competition, and to discourage such competition from even attempting to upgrade their facilities to become more competitive with those of defendants.

■ If, by making this allegation, plaintiff seeks to assert the claims raised by other competitors, it does not have standing to do so. Section 4 of the Clayton Act provides that "any person who shall be injured in his business or property by reason of anything forbidden in the antitrust laws may sue therefor. . . ." In construing Section 4, courts have held that this provision requires a plaintiff to prove two elements

in order to have standing to sue: (1) injury to a specific "business or property" interest of the plaintiff, which injury is (2) "by reason of" defendants' violation of the antitrust laws because plaintiff is the "target" of defendants' anticompetitive action. *Commerce Tankers v. Nat. Maritime U. of America*, 553 F.2d 793, 800–01 (2d Cir.), *cert. denied*, 434 U.S. 923, 98 S.Ct. 400, 54 L.Ed.2d 280 (1977); *Billy Baxter, Inc. v. Coca-Cola Company*, 431 F.2d 183, 187 (2d Cir. 1970), cert. denied 401 U.S. 923, 91 S.Ct. 877, 27 L.Ed.2d 826 (1971); *Laurie Visual Etudes v. Chesebrough-Pond's Inc.*, 473 F.Supp. 951, 955 (S.D.N.Y.1979); *see generally* Areeda & Turner, 2 *Antitrust Law* 160–69 (1977).

In the instant case, plaintiff cannot satisfy either prong of the test for standing. Plaintiff does not allege that it competes in either the Pittsburgh or Orlando television advertising markets. Thus, even assuming the truth of plaintiff's allegation that defendants did appear before administrative agencies without probable cause for the purpose of deterring their competitors in these markets from improving their facilities, such a claim does not state an injury to a specific "business or property" interest of plaintiff which competes in Syracuse, New York. The conclusion that plaintiff does not satisfy the second prong of the standing requirement necessarily flows out of the Court's holding as to "direct injury" requirement. Since plaintiff does not compete with defendants in the Pittsburgh or Orlando television advertising markets, it cannot be a target or direct object of defendants' alleged conspiracy. *See Calderone Enter. Corp. v. United Artists Theatre Circuit*, 454 F.2d 1292, 1296 n. 2 (2d Cir. 1971), *cert. denied* 406 U.S. 930, 92 S.Ct. 1776, 32 L.Ed.2d 132 (1972).

Also, plaintiff argues that defendants have denied other competitors access to governmental process as circumstantial evidence that defendants have done the same in this case. This argument is unpersuasive. Plaintiff has not clearly alleged what type of access-barring conduct was committed by defendants in these other cities.

Without more specific allegations, it is apparent that the type of conduct plaintiff claims to be "sham" is nothing more than appearing before governmental agencies, which is a right protected by the First Amendment. Moreover, even though proof of such access-barring conduct could have clarified plaintiff's allegation, such proof has not been presented by plaintiff. Consequently, plaintiff has not met its burden of demonstrating that triable issues of fact exist with respect to its claim that defendants have systematically conspired to deny its competitors access to governmental process.

Finally, plaintiff claims that because its complaint is similar to the complaint in *California Motor Transport Co. v. Trucking Unlimited*, 404 U.S. 508, 92 S.Ct. 609, 30 L.Ed.2d 642 (1972), by its allegation that defendants made misrepresentations before government agencies, which effect was to deny plaintiff access to those agencies, its complaint should survive defendants' motion for summary judgment and dismissal. Unfortunately, plaintiff has misconstrued the requirements of the Federal Rules of Civil Procedure. First, the party opposing a summary judgment motion must set forth "concrete particulars", *Dressler v. MV Sandpiper*, 331 F.2d 130, 133 (2d Cir. 1964), and it is not sufficient to assert conclusions without supplying supporting argument or facts in opposition to the motion. *S.E.C. v. Research Automation Corp.*, 585 F.2d 31, 33 (2d Cir. 1978). "Indeed, the policy favoring efficient resolution of disputes, which is the cornerstone of the summary judgment procedure, would be completely undermined if unsubstantiated assertions were sufficient to compel a trial." *Id.* This policy is especially meaningful in the present case, where defendants are put to the task of costly antitrust litigation, based upon conduct that is protected under the First Amendment. *Franchise Realty, Etc. v. S.F. Loc. Joint Exec. Bd., supra*, 542 F.2d at 1082–83. *Weiss v. Willow Tree Civic Assoc., supra*, 467 F.Supp. at 802; *Federal Prescription Service v. Am. Pharm. Ass'n.*, 471 F.Supp. 126, 128 (D.D.C.1979); *Wilmorite, Inc. v. Eagan Real Estate, Inc.*,

454 F.Supp. 1124, 1137 (N.D.N.Y.1977). Similar considerations militate in favor of requiring plaintiffs to be specific in their pleading of *Noerr-Pennington* claims in order to withstand a motion to dismiss. *Franchise Realty Interstate Corp. v. S.F. Loc. Jt. Exec. Bd. of Culinary Workers, supra*, 542 F.2d at 1082; *Wilmorite, Inc. v. Eagan Real Estate, Inc., supra*, at 1135; *Ernest W. Hahn, Inc. v. Codding*, 423 F.Supp. 913, 916 (N.D.Cal.1976). In the present case, the Court believes that plaintiff has not stated a claim or demonstrated that triable issues of fact exist with respect to its *Noerr-Pennington* allegations, and therefore plaintiff's complaint is dismissed on this issue.

### VI.

By way of conclusion, plaintiff's motion to amend its complaint is granted. The Court, however, grants defendants' motions to dismiss and for summary judgment. The dismissal of plaintiff's claims is in all respects on substantive grounds. *Wilmorite, Inc. v. Eagan Real Estate, Inc.*, 454 F.Supp. 1124, 1128 (N.D.N.Y.1977). Since plaintiff's federal claims have been dismissed, the state claims are dismissed for lack of pendent jurisdiction. *United Mine Workers v. Gibbs*, 383 U.S. 715, 726, 86 S.Ct. 1130, 1139, 16 L.Ed.2d 218 (1966).

It is so ordered.